[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-11776

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 29, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00142-CR-F-N

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

JOANNA HERNANDEZ,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(July 29, 2005)**

Before EDMONDSON, Chief Judge, DUBINA and HULL Circuit Judges.

EDMONDSON, Chief Judge:

In this criminal case, the government appeals the district court's order

granting Defendant's motion to dismiss and motion to suppress evidence seized

from her pick-up truck during a traffic stop. The government argues that the

police officer -- very soon after the stop began -- had reasonable suspicion that the passengers were engaged in other criminal activity justifying the detention that led to the pertinent search. We conclude that the search and seizure did not violate Defendant's Fourth Amendment rights.

Background

Alabama State Trooper Jessie Peoples observed a pick-up truck traveling 78 miles-per-hour in a 70 mile-per-hour zone. At approximately 3:02 a.m.[1] on a Monday, Trooper Peoples pulled the truck over. The Trooper approached the passenger side of the truck and requested the driver to exit. A female passenger, Defendant, sat in the front seat. The Trooper noticed several food containers in the rear floor area.

The driver provided the Trooper with a Texas driver's license. As an excuse for speeding, the driver stated that Defendant had diarrhea and needed to go to the bathroom. The Trooper pointed out that the lighted previous exit had bathrooms. The Trooper asked the driver about where he was headed and the purpose and length of the trip. The driver responded that he was driving to

_____

[1]The time is inferred from a videotape of the traffic stop that was recorded from the patrol car.

2

Atlanta to see Defendant's relative for the weekend but quickly changed his response to the whole week.

At 3:03 a.m., the Trooper escorted the driver to the front passenger seat of the patrol car. As the Trooper began writing the citation, the Trooper asked the driver about the weather in Houston upon his departure, whether he owned the truck, whether this visit was his first time to Atlanta, whether the trip had been planned or was spontaneous, his employment, and the name of the passenger. The driver responded that a severe storm was in Houston when they left. He stated that Defendant owned the truck and that it was his, but not her, first time to Atlanta.

Just before 3:06 a.m., the Trooper returned to the pick-up truck to talk with Defendant. He asked whether she owned the truck and requested the registration and some identification. He asked her what kind of work she did. To verify the driver's story, the Trooper then asked Defendant how long she planned to be in Atlanta. She said that she was visiting a sick aunt and would stay probably until Wednesday, depending on her aunt's condition. The Trooper asked where Defendant's aunt resided in Atlanta. Defendant had difficulty answering where the aunt lived, noting that she thought it started with a "G" or "Gaines." In response to the Trooper's question about whether it was "Gwinnett," she stated "yes." The Trooper questioned Defendant about whether the two small bags that

3

he viewed in the back seat of the truck were the only luggage that they had brought for the trip. She responded affirmatively.

Around 3:08 a.m., the Trooper returned to the patrol car and again asked the driver about the purpose of the trip and whether they were driving all night. The driver responded that they -- on their trip from Houston to Atlanta -- had been traveling non-stop. After the driver made no mention of Defendant's sick aunt, the Trooper further questioned whether they were visiting a sick relative; the driver responded "no."

With the driver still in the patrol car, just before 3:09 a.m., the Trooper contacted United States Customs to check the license validation, the vehicle registration, whether warrants existed for the driver or Defendant, and whether the vehicle had crossed national borders. The Trooper testified that he contacts Customs in over two-thirds of his stops and that, as a general practice, he does not conclude a traffic stop until receiving a response from the agency. Around 3:12 a.m., the Trooper informed the driver that the Trooper would be issuing a warning. The warning was close to, if not fully, written at this time. But the Trooper testified that he did not consider the traffic stop to have ended because he had not heard back from Customs; he did not deliver the written warning to the driver at this time.

4

The Trooper then walked to the truck to return Defendant's license and registration. The Trooper observed that Defendant seemed unusually nervous.

The Trooper testified that he, after his conversations with the driver and Defendant, decided to call Chris Brown, a State Trooper who works with a narcotics canine.[2] Trooper Peoples testified that based on the following observations, he decided to ask for consent to search the vehicle: (1) the driver's excuse for the speeding -- that Defendant suffered diarrhea -- despite the availability of restroom facilities at the previous exit; (2) empty food containers in the vehicle; (3) discrepancies in the driver's and Defendant's stories about the trip's length and purpose; (4) a level of nervousness exhibited in both the driver and Defendant that -- in the Trooper's experience -- was higher than that of the normal motoring public; (5) the decision to begin travel during severe weather in Houston and to continue at night without stopping; (6) Defendant's lack of knowledge about the trip's destination; (7) travel between two main source cities for narcotics; and (8) minimal luggage carried for a supposed week-long trip.

Trooper Peoples then returned to the police car and asked the driver whether they were transporting anything illegal. The driver responded negatively. The

---

[2]Trooper Peoples called Trooper Brown just before obtaining consent to search the truck. Trooper Brown arrived on the scene shortly thereafter.

Trooper asked the driver for consent to search the truck. The driver agreed and signed a consent form. At 3:18 a.m., the Trooper asked Defendant for permission to search; she also signed the consent form.

Around 3:19 a.m., Trooper Peoples began a search of the truck that lasted approximately twenty minutes. Around 3:28 a.m., Trooper Brown positioned his dog on the passenger side of the truck; the dog gave a positive response to the presence of narcotics. Trooper Peoples then located vacuum-sealed packages behind a concealed trap door; the packages, upon testing, were determined to hold cocaine. By the time that the driver and Defendant were arrested for the cocaine (around 3:38 a.m.), the Trooper still had not heard back from Customs. During the course of the search, the Troopers offered to take Defendant to the exit with the restroom facilities; she declined the offer.

Defendant filed a motion to dismiss and a motion to suppress the evidence. The district court granted the motions. The Government now appeals.

Discussion

I. <u>District Court Decision</u>

The district court concluded that the Trooper's interrogation of Defendant and the driver went beyond what that court understood to be the strict limits of questions allowed at a traffic stop. The judge then concluded that, either because such questions were asked at all or because asking the questions prolonged the duration and enlarged the scope of Defendant's detention, the traffic stop was unconstitutional before Defendant consented to the search. To be more specific, the district court seemed to think that, because the Trooper -- before he began to write the citation or to call for a computer check -- asked the driver and Defendant questions that the district court saw as unrelated to either officer safety, the speeding offense, or processing the citation, the seizure must be unconstitutional.[3]

---

[3]The district court tried to sort out some of our, and other circuits', earlier decisions on traffic stops. After the district court issued its opinion, the Supreme Court concluded that it is unreasonable extensions of the duration -- not the scope of conversation -- that could render an otherwise justified detention unreasonable for Fourth Amendment purposes. "[M]ere police questioning does not constitute a seizure," -- even if such questioning is about a topic unrelated to the initial purpose of the search or seizure -- so long as it does not "prolong[] . . . the time reasonably required to complete that [initial] mission." Muehler v. Mena, 125 S.Ct. 1465, 1471 (2005) (internal quotations and citations omitted) (holding that no independent reasonable suspicion was required for officers to question person about immigration status while being detained during search for weapons and evidence of gang membership). Although the seizure in Muehler was conducted pursuant to a search warrant, we believe that the focus on duration (and not scope of questioning) is just as applicable to

Stressing the resultant delay, the district court also observed that the questions "necessarily prolonged" the detainment and stated that "this is true even though the total time between the beginning of the stop and the consent to search does not run afoul of the cases setting an outside limit for the total length of a detention for a traffic stop." Memorandum Opinion and Order, United States v. Hernandez, CR No. 03-142-N (M.D. Ala. March 22, 2004), at 28. The district court reasoned that, because the seizure -- seemingly from when the first question was asked that was not strictly necessary for the traffic offense -- already "violated the parameters set out in Terry," all of the evidence obtained from the encounter (including the search) had to be suppressed as "fruit of the poisonous tree." Id. at 24, 28-29.

We disagree. We conclude that objective reasonable suspicion existed that Defendant was engaged in other criminal activity and that reasonable suspicion justified the detention up to the point Defendant consented to the search.

---

a lawful traffic stop.

Therefore, arguments that the Trooper asked questions unrelated to either officer safety, the speeding offense, or processing the citation are not determinative of our evaluation of the constitutionality of the seizure here. We are to look only at the duration of the seizure given all the circumstances: was it for an unreasonable time? And, of course, a traffic stop will inherently take some time. When an officer is, for instance, looking at a driver's license or waiting for a computer check of registration, he lawfully can at about the same time also ask questions -- even questions not strictly related to the traffic stop.

II.  Analysis

We stress that no one contends that this stop was an unlawful stop at its inception:  Defendant does not dispute that the Trooper observed the vehicle violate the speed limit.  We also observe that Defendant does not contest that she, in fact, consented to the search.[4]  Once Defendant gave her consent, the clock re-started for purposes of evaluating the reasonableness of the duration of the intrusion.  See United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999) (stating that "further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter").  No contention is made that the *search* here lasted an unreasonably long time.  Therefore, it is only the intermediate period of seventeen minutes of detention leading up to the consent to search that we must evaluate for constitutional reasonableness.  See United States v. Purcell, 236 F.3d 1274, 1279 (11th Cir. 2001) (considering only portion of stop

[4]Although Defendant argues that the consent was tainted by the illegal detention, she makes no argument that the consent -- in and of itself -- was illegally obtained (for example, that it was coerced or fraudulently obtained).  Because we conclude that Defendant was legally detained when she consented to the search, we cannot agree that the consent was invalid as fruit of the poisonous tree. Cf. Florida v. Royer, 103 S.Ct. 1319, 1329 (1983) ("Because we affirm the . . . conclusion that [defendant] was being illegally detained when he consented to the search of his luggage, we agree that the consent was tainted by the illegality and was ineffective to justify the search.")
    We also reject Defendant's argument that because the Trooper, since the date of the pertinent stop, has testified that he intended to search the vehicle regardless of consent, we should analyze this search as if there were no consent at all.  An officer's "subjective intentions" are not relevant for Fourth Amendment analysis.  See Whren v. United States, 116 S.Ct. 1769, 1774 (1996).

9

before lawful consent to search as relevant to inquiry of whether duration was unconstitutional). Because Defendant was lawfully detained when she consented, her consent validated the search.

From the first minute of the stop, the driver and Defendant demonstrated suspicious behavior that could warrant an objectively reasonable policeman to believe that Defendant might be involved in other criminal activity. Defendant was traveling at three o'clock in the morning, and the Trooper was able to observe the food containers and small amount of luggage when he first approached the pick-up truck. He testified that he considered the food containers suspicious because people transporting contraband often drive long distances without leaving their vehicles, because they fear leaving the contraband unattended. In fact, the Trooper had received drug interdiction training which instructed that the presence of food containers was a factor that may raise reasonable suspicion in a traffic stop situation.

The Trooper doubtlessly had the right to inquire into why the vehicle was speeding. Later at a hearing, in response to a question asking when he became suspicious, the Trooper stated "[t]he one factor was the restroom issue." The implausibility that the truck was speeding because Defendant was suffering from diarrhea -- after they had just passed a lighted exit with restroom facilities in rural

Alabama at 3 a.m. (where rest stops were few and far between) -- combined with the Trooper's observation of the food containers and minimal luggage, creates a more suspicious set of circumstances than a mere demonstration of nervousness, use of an out-of-state license, or habit of repeating questions before answering. Cf. United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003) (concluding nervousness, repetition of questions, possession of out-of-state license, and inconsistent statements regarding destination alone insufficient for reasonable suspicion).

And unlike the defendant in United States v. Boyce, 351 F.3d 1102, 1109 (11th Cir. 2003), the driver here never provided an explanation for the implausible speeding excuse upon further questioning. See id. (noting that officer's suspicions that driver would not travel such long distance for ex-girlfriend "virtually evaporated and any justification . . . for further investigation [based on this inconsistency] dissipated" once driver explained he was not sure of current status of relationship (internal quotation marks omitted) (brackets in original)). Therefore, right from the start, the Trooper had reason to suspect that he was not dealing with just a speeding case and, thus, reason to detain Defendant longer than perhaps a traffic stop, in itself, would allow.

Once the Trooper developed this reasonable suspicion, he had a duty to investigate more.  United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) ("Where . . . the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then came to his attention." (internal quotation marks omitted) (brackets in original)).  We note that as each answer to the Trooper's investigative questions failed to allay his concerns, the Trooper's reasonable suspicion was bolstered, thus justifying his continuing to detain Defendant, his call for the dog,[5] and his request to search the truck.  By the time the Trooper sought permission to search the truck, at least these circumstances provided a reasonable officer with a "minimal, particularized basis," Pruitt, 174 F.3d at 1221, for reasonable suspicion:  (1) the implausible excuse for speeding; (2) empty food containers in the vehicle; (3) discrepancies in stories about the trip's length and purpose; (4) abnormal nervousness in both detainees; (5) nonstop travel at night in severe weather; (6) lack of knowledge on the trip's destination; (7) travel between two main source cities for narcotics; and (8) minimal luggage.[6]

---

[5]We have concluded that a "canine sniff . . . is the kind of brief, minimally intrusive investigation technique that may justify a Terry stop."  United States v. Hardy, 855 F.2d 753, 759 (11th Cir. 1988).

[6]Again, several of these factors were highlighted in the Trooper's drug interdiction training as circumstances that might raise suspicion in a traffic stop.  The Trooper testified that he was instructed that travel at night during inclement weather, nonstop travel, the presence of food containers, inconsistent answers on the trip's length and purpose, confusion about destination and length of stay, unusual nervousness, and travel between source cities, are all characteristic of drug courier transport.

From the start and thereafter with additional revelations, the circumstances -- taken together -- gave rise to a more worrisome set of circumstances than the cases where we have concluded that no basis for reasonable suspicion existed. Cf. Boyce, 351 F.3d at 1109 (concluding that driving rental car on known drug corridor and planning to return car two days late was insufficient for reasonable suspicion); United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir. 1990) (concluding that "being Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates" was insufficient for reasonable suspicion). Even *if* the duration of the pre-consensual detention in this case did extend beyond what might have been reasonable for just a routine traffic stop, the facts that came to light from the beginning of the stop -- facts giving rise to reasonable suspicion that an additional crime was being committed -- were more than sufficient to justify this detention of no more than seventeen minutes.

## Conclusion

For the foregoing reasons, we conclude that the detention and search were constitutional. Therefore, the district court's orders granting Defendant's motion

13

to dismiss and motion to suppress are REVERSED and the case is REMANDED

for further proceedings consistent with this opinion.[7]

---

[7]We have decided this case on the basis of the argument made to us: that, apart from the Trooper's looking into the traffic violation itself, additional circumstances continued to arise and to confront the Trooper that signaled another crime and justified prolonging the stop. But something else seems worth pointing out. Where at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short. By the way, no appellate decision has been called to our attention that has held such a short detention -- linked to a legitimate traffic stop -- to be an unreasonable seizure under the Fourth Amendment on account of the stop's duration.

A traffic stop for speeding can doubtlessly last long enough for the police to ask questions about the reasons for speeding and to conduct a variety of checks about licenses, registration, insurance and so on. We underline that the police are not constitutionally required to move at top speed or as fast as possible. See, e.g., United States v. Sharpe, 105 S.Ct. 1568, 1575 (1985) ("While it is clear that the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion, we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." (internal quotations and citation omitted)). For the police to be vigilant about crimes is, at least broadly speaking, a good thing. And at a traffic stop, the police can occasionally pause for a moment to take a breath, to think about what they have seen and heard, and to ask a question or so. The police are authorized to detain traffic violators for a *reasonable* amount of time. No one has contended that the detention here was done in an abusive manner. No evidence in the record shows that seventeen minutes is significantly longer than the range of normal for a traffic stop for a moving violation. Even *if* seventeen minutes is some minutes longer than the norm, we question whether the Fourth Amendment's prohibition of unreasonable seizures is concerned with such trifling amounts of time, when the seizure was caused at the outset by an apparent violation of the law. Of trifles the law does not concern itself: *De minimis non curat lex*. This ancient legal maxim seems especially pertinent when it is the Constitution that we are being asked to apply.