[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10997
Non-Argument Calendar
_____

D.C. Docket No. 9:14-cv-81248-DTKH

MARTIN O'BOYLE,

Plaintiff - Appellant,

versus

WILLIAM H. THRASHER,
individually,
GARRET WARD,
individually,
 TOWN OF GULF STREAM,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 14, 2016)

Before HULL, MARCUS and ROSENBAUM, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Martin O'Boyle appeals from the district court's final order dismissing his amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. O'Boyle's complaint raised federal claims under 42 U.S.C. § 1983 based on the unlawful seizure of his property and person in violation of the Fourth Amendment as well as state law assault and battery claims. These claims arose from alleged interactions he had with officials employed by the Town of Gulf Stream, Florida on two separate occasions -- first, by Gulf Stream Town Manager William Thrasher, and second, by Gulf Stream Chief of Police Garrett Ward. On appeal, O'Boyle argues that the district court erred: (1) when it concluded that Ward's seizures of O'Boyle's papers and of O'Boyle's person were reasonable under the Fourth Amendment; and (2) when it dismissed his state law claims for being conclusory. After thorough review, we affirm.

We review de novo a grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, "accepting the factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff." Glover v. Liggett Grp., Inc., 459 F.3d 1304, 1308 (11th Cir. 2006). To survive dismissal, a complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation omitted). This "requires more than

2

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not" be enough to survive a Rule 12(b)(6) motion to dismiss. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). We may affirm a dismissal "on any ground that finds support in the record," even if the district court did not rely on it. <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004).

The relevant facts -- as contained in the complaint -- are these. O'Boyle alleges that on July 15, 2014, he entered the office of Gulf Stream's Town Clerk and was accompanied by a "clean air technician" he had retained to take air samples in the Town Hall, as well as an assistant carrying videotaping equipment. As authorization for this activity, O'Boyle presented Police Chief Ward and the Town Clerk with a copy of "a court order from Atlantic County, New Jersey concerning [his] ability to videotape while in public buildings." The Town Clerk copied the docket number and other information so that the court document could be retrieved through a public records request. Upon request, O'Boyle handed Chief Ward the order to inspect, but when Chief Ward said he was going to copy it, O'Boyle "immediately and unequivocally instructed [Chief Ward] that he did not consent to have the document copied, only inspected and returned." As O'Boyle attempted to retrieve the order, Chief Ward allegedly grabbed O'Boyle's "right-hand wrist and forearm to prevent [him] from retrieving the document," but O'Boyle was able to "quickly retrieve[]" the order with his free left hand before it

was copied.  According to O'Boyle, Chief Ward "shoved [O'Boyle] with his whole body almost knocking him onto the sharp edges of a nearby desk."  Chief Ward "then grabbed plaintiff's right wrist and elbow with both hands and forcibly ejected the plaintiff from the copy machine area," and said O'Boyle "was being disruptive and . . . would be arrested if he did not immediately leave the building."

On another occasion, on September 8, 2014, O'Boyle alleges that he entered the Town Hall "to conduct public business, mainly inspect and/or attempt to retrieve public records," again "accompanied by his associate who filmed the interaction."  He was then approached by Town Manager Thrasher who "became irate with plaintiff regarding a discussion about public records."  O'Boyle claims that "[a]t one point, [Town Manager Thrasher] took an aggressive 'pre-combat' stance and extended his arm towards [O'Boyle's] chest as if he were going to push and make contact with [O'Boyle's ] left breast."  Instead of shoving, Town Manager Thrasher allegedly "extended his finger and brought it close to [O'Boyle's] body, within an inch or so of [O'Boyle's] chest."  Thrasher allegedly demanded to know if he was being recorded, and "began to repeatedly harass Mr. O'Boyle's associate in a rude and demeaning tone regarding the recording." O'Boyle himself then took the video camera to begin recording Thrasher's actions, at which point Thrasher allegedly "stuck his nose into the camera making contact with the camera and thus [O'Boyle]."

4

First, we are unpersuaded by O'Boyle's argument that the district court erred in dismissing his property seizure claim. The Fourth Amendment requires that searches and seizures be reasonable. U.S. Const. amend. IV. While a search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing, the Supreme Court has "upheld certain regimes of suspicionless searches where the program was designed to serve 'special needs, beyond the normal need for law enforcement'" or to serve "certain administrative purposes . . . provided that those searches are appropriately limited." City of Indianapolis v. Edmond, 531 U.S. 32, 37-38 (2000) (gathering cases upholding suspicionless searches involving random drug testing of student-athletes; drug tests for United States Customs Service employees seeking transfer or promotion to certain positions; drug and alcohol tests for railway employees involved in train accidents or found to be in violation of particular safety regulations; administrative inspection of premises of "closely regulated" business; administrative inspection of fire-damaged premises to determine cause of blaze; and administrative inspection to ensure compliance with city housing code).

In City of Indianapolis, the Supreme Court also recognized "the validity of border searches or searches at places like airports and government buildings, where the need for such measures to ensure public safety can be particularly acute." Id. at 47-48 (distinguishing airport and government building searches from a city

5

checkpoint program in which its primary purpose was "ultimately indistinguishable from the general interest in crime control"). In these special situations, "the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Skinner v. Railway Labor Exec. Ass'n, 489 U.S. 602, 619 (1989) (quotation omitted). In addition, the Supreme Court has acknowledged "a de minimis level of imposition with which the Constitution is not concerned." Ingraham v. Wright, 430 U.S. 651, 674 (1977); see also United States v. Jacobsen, 466 U.S. 109, 125 (1984) (holding that destruction of a small amount of cocaine powder during a field test was a de minimis violation where "only a trace amount of material was involved," the cocaine's previous possessors did not seem to have noticed its loss, and the cocaine had already been lawfully detained); Cardwell v. Lewis, 417 U.S. 583, 591-92 (1974) (plurality opinion) (examination of automobile's tires and taking of paint scrapings was a de minimis invasion of constitutional interests); United States v. Hernandez, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005) (stating that "[o]f trifles the law does not concern itself: De minimis non curat lex").

For starters, Chief Ward did not violate O'Boyle's Fourth Amendment right when he did not immediately return the court order to O'Boyle. As the complaint alleges, O'Boyle voluntarily relinquished his possessory interest in the order at the

outset for the specific purpose of an official inspection to be conducted by Chief Ward; the substance of the order was a matter of public record; and once O'Boyle said that he wanted the order back, Chief Ward only retained it in order to photocopy it. Although the complaint does not estimate for how long Chief Ward held onto the order after O'Boyle's asked for its return, it describes the encounter as taking place over the amount of time it took the parties to approach the copy machine, at which point O'Boyle positioned his right hand over the machine and "quickly retrieved" the order with his left hand. Given the briefness of this encounter and the property at stake -- a court order allegedly available publicly -- we cannot say that there was anything more than a de minimis intrusion on O'Boyle's property rights. Moreover, in balancing the alleged seizure against the Town's undisputed interest in conducting searches of individuals entering public buildings, see City of Indianapolis, 531 U.S. at 47-48 -- especially here, where O'Boyle claimed he had obtained permission from a New Jersey court to videotape inside a Florida Town Hall -- we conclude that Chief Ward did not violate O'Boyle's Fourth Amendment right when he briefly retained the court order that O'Boyle intended Chief Ward to read and rely upon in his official capacity.

Nor are we convinced by O'Boyle's argument that the district court erred in dismissing his claim that Chief Ward unlawfully seized his person. "When the actions of the police do not show an unambiguous intent to restrain . . . a seizure

7

occurs if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Brendlin v. California, 551 U.S. 249, 255 (2007) (quotation and citation omitted). Notably, "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied." West v. Davis, 767 F.3d 1063, 1068 (11th Cir. 2014). Courts consider "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police." Id. at 1074 (quotation omitted). The "ultimate inquiry" is whether the officer used force as a means of "coercion that would make [the plaintiff] feel he was not free to leave." Miller v. Harget, 458 F.3d 1251, 1258 (11th Cir. 2006).

Construing the facts in a light most favorable to O'Boyle, we simply do not see how a reasonable person in O'Boyle's position would not have believed that he was free to leave at any time. Specifically, the complaint describes the encounter

8

as beginning when O'Boyle placed his hand over the copy machine that Chief Ward was attempting to use and snatched the order from Chief Ward with his other hand.    During this encounter, Chief Ward grabbed O'Boyle's hand, shoved O'Boyle, and "grab[bed] Plaintiff's wrist and elbow in order to restrict or direct his physical movement" and to "forcibly eject[] the Plaintiff from the copy machine area."  Chief Ward then told O'Boyle that he was being disruptive and would be arrested if he did not immediately leave the building.    In short, the complaint admits that Chief Ward's actions were done in an attempt to "eject" O'Boyle from the copy area, and that Ward confirmed that O'Boyle should leave the building. The complaint does not suggest that O'Boyle did not feel free to leave.

This is true even though Chief Ward allegedly used physical contact to grab O'Boyle's arm and escort him from the copy machine.  Indeed, when Chief Ward grabbed O'Boyle's wrist and pushed him away, the only conduct O'Boyle was prevented from doing was standing next to the copier -- which, O'Boyle admits, was "out of the Clerk's office."  Nowhere does O'Boyle allege that he otherwise was permitted access to the copy-machine area outside the Clerk's office or had "business" there, especially since, as we've already discussed, Ward had not acted unlawfully in attempting to copy the order.  Thus, unlike the plaintiff in West, O'Boyle was "free to walk away or end the encounter and proceed about [his] business."  West, 767 F.3d at 1070.  Furthermore, once Chief Ward escorted

9

O'Boyle from the area, O'Boyle remained on the scene without any force of any kind being used. According to the complaint, "[a] few minutes" after O'Boyle's encounter with Chief Ward, O'Boyle asked Ward if the clean air technician would be arrested, and Ward said no. In short, because the complaint describes O'Boyle as always being free to leave, we cannot conclude that he was seized by Chief Ward under the Fourth Amendment.

Finally, we find no merit to O'Boyle's claim that the district court erred by dismissing his state law claims of assault and battery against Chief Ward and Town Manager William Thrasher for being conclusory. O'Boyle's state law claims against Chief Ward arose from the incident with the copy machine. His state law claims against Town Manager Thrasher arose from the separate incident during which O'Boyle was videotaping another visit to the Town Hall when Thrasher became "irate" in a discussion about "public records," pointed a finger close to O'Boyle's chest, and then stuck his nose in the video camera O'Boyle was holding. The district court concluded that Chief Ward and Town Manager Thrasher were entitled to statutory immunity against the state law claims.

Under Florida law,

[n]o officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee or agent acted in bad faith or with malicious purpose

10

or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a).

In the complaint, O'Boyle alleged, in each state law claim and with very similar language, that the Defendants Thrasher and Ward "acted intentionally in bad faith, with malicious purpose, and in a manner exhibiting wanton and willful disregard for human rights and safety." Florida law provides that "[m]alice, intent, knowledge, mental attitude, and other conditions of mind of a person may be averred generally." Kist v. Hubbard, 93 So. 3d 1100, 1102 (Fla. Dist. Ct. App. 2012) (citing with approval a case in which a plaintiff had successfully pled malice by providing that the "prosecution . . . was commenced . . . from malice towards the plaintiff; that certain acts were committed by the [defendant] and these actions were taken with actual malice."). However, the Supreme Court has squarely rejected pleadings alleging malice as O'Boyle has alleged:

> It is true that Rule 9(b) requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid -- though still operative -- strictures of Rule 8. See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p. 291 (3d ed. 2004) ("[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in Rule 8(a) ... should control the second sentence of

11

Rule 9(b)"). And <u>Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss.</u>

<u>Ashcroft</u>, 556 U.S. at 686-87 (emphasis added). Since O'Boyle pled nothing more than the "bare elements" of malice, bad faith, and wanton and willful disregard, his state law claims do not sufficiently overcome § 768.28(9)(a) immunity.

Nor do the limited factual allegations alleged in the complaint demonstrate that Chief Ward and Town Manager Thrasher acted with the requisite bad faith, malice, and wanton and willful disregard needed to overcome § 768.28 immunity. Indeed, Florida courts have held that bad faith, malice, and wanton and willful disregard language found in § 768.28(9) "connotes conduct much more reprehensible and unacceptable than mere intentional conduct." <u>Richardson v. City of Pompano Beach</u>, 511 So. 2d 1121, 1123 (Fla. Dist. Ct. App. 1987). But in describing his encounters with Chief Ward and Town Manager Thrasher, O'Boyle has alleged nothing more than "mere intentional conduct," rather than the kind of extraordinary conduct required for bad faith, malice, and wanton and willful disregard. Among other things, O'Boyle has not alleged that the physical contact was repeated or prolonged, or that he was knocked down, transported to the hospital, permanently injured, or that he otherwise suffered from "reprehensible" conduct. Accordingly, the district court did not err in dismissing O'Boyle's state law claims for failure to overcome the immunity found in § 768.28(9).

12

**AFFIRMED.**