(190 P.3d 1002)
No. 97,447

STATE OF KANSAS, *Appellee*, v. RONNIE MORLOCK, *Appellant*.

Opinion filed August 29, 2008.

*Mark T. Schoenhofer*, of Law Office of Mark T. Schoenhofer, of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Paul J. Morrison*, attorney general, for appellee.

Before LEBEN, P.J., MALONE and GREENE, JJ.

*Per Curiam*: Ronnie Morlock appeals his convictions of possession of marijuana with intent to sell and no tax stamp. Morlock claims the district court erred in denying his motion to suppress the evidence. This case arose from a traffic stop in which Morlock was the passenger. Specifically, Morlock claims that the arresting officer violated his constitutional rights by asking questions about travel plans which were unrelated to the purpose and the scope of the traffic stop. Morlock also claims that the arresting officer exceeded the reasonable scope and duration of the traffic stop when he ran a warrant check on Morlock's driver's license without reasonable suspicion of criminal activity.

### Factual and procedural background

On February 3, 2006, at 5:22 p.m., Deputy Henry Cocking of the Sedgwick County Sheriff's Department was traveling eastbound on Highway 54 when he observed a van with Arizona tags driving in front of him. Cocking worked as a K-9 handler and primarily investigated narcotics. His work shift that day was ending, and Cocking was on his way home with his narcotics-detection dog in the back of the patrol vehicle. Cocking followed the van for approximately 1 mile and noticed the driver failed to signal two different times when changing lanes. Cocking activated his emergency lights and stopped the van. Once Cocking activated his emergency lights, the video mounted in his patrol vehicle began recording, although the audio failed to record.

Cocking approached the driver of the van, Ronald O'Kelly, who was 16-years-old, and Cocking asked O'Kelly to produce his driver's license. Cocking noticed that O'Kelly was nervous when obtaining his driver's license, that he was shaking and trembling, and that he dropped the license into his lap. Cocking also noticed that the passenger, Morlock, was staring straight ahead and never looked at Cocking. Cocking thought the behavior of both O'Kelly

and Morlock was odd, although he admitted some young drivers, like O'Kelly, may be nervous when stopped by an officer.

Cocking asked O'Kelly to step out of the vehicle, and he and O'Kelly walked to the rear of the van. Cocking asked O'Kelly if the information on his driver's license was correct and "where he was coming from." O'Kelly said that the information was correct and that he was traveling from Phoenix to Kansas City. Cocking asked O'Kelly how long he had been in Phoenix, and O'Kelly indicated a couple of days. Cocking asked O'Kelly why he was in Phoenix, and O'Kelly said he was visiting his dad's girlfriend. O'Kelly also told Cocking that the van was rented by his dad. He identified his dad as Morlock, the passenger of the van. ·

At that point, Cocking went to the passenger side of the van and asked Morlock for the rental agreement and his driver's license. While Morlock was looking for the rental agreement, Cocking asked him "where he was going or coming from." Morlock said he was traveling from Phoenix to Kansas City. Cocking asked Morlock how long he had been in Phoenix, and Morlock responded he had been in Phoenix for 2 days. Cocking asked Morlock why he went to Phoenix. Morlock responded that he went to see a woman he had met on the Internet, but he was unable to contact her. Upon examining the rental agreement, Cocking determined that the van was rented from Tucson and not from Phoenix. Cocking asked Morlock about this discrepancy, and Morlock said he had flown into "a Phoenix/Tucson airport located right in that area." Cocking asked Morlock why he flew to Phoenix but was driving back. Morlock explained that he did not have enough money to purchase a return flight, so he rented the van.

Cocking then took both driver's licenses and the rental agreement to his patrol vehicle. While walking past the van, Cocking looked into the rear window and noticed four bags in the cargo area. Cocking found the number of bags unusual because Morlock and O'Kelly had said they were in Phoenix for only a couple of days. While in the patrol vehicle, Cocking wrote O'Kelly a warning citation and ran both names through a warrant check.

When both names cleared the warrant check, Cocking returned to the passenger side of the van. Both Morlock and O'Kelly were

seated in the van. Cocking handed the documents to Morlock, stepped back, and said, "Have a nice day." Cocking turned and walked one or two steps away from the van toward his patrol vehicle, and then he turned and reapproached the van. The passenger window was still down. Cocking asked, "Hey, do you mind if I ask you a couple of questions?" Morlock and O'Kelly both responded, "Yeah, go ahead." Cocking testified that he spoke in a friendly manner and he never displayed his firearm when he reapproached the van.

Cocking asked Morlock and O'Kelly if they would mind stepping out of the van, and both complied. Cocking directed them to stand near the front of the van. Cocking asked Morlock if he could search his person for weapons, and Morlock agreed. Cocking searched and found no weapons on Morlock; Cocking then told Morlock that large amounts of drugs were transported on Highway 54 and asked him if he had drugs or weapons in his van. Morlock said he did not. At that point, Cocking asked, "Can I search your car?" and Morlock responded, "Yes."

After opening the rear of the van, Cocking opened one of the suitcases in the cargo area. Cocking observed cellophane packages that he believed were packaged drugs. Cocking stuck a knife into one of the packages, and he smelled and saw marijuana. Cocking then arrested both Morlock and O'Kelly and called for backup. Law enforcement officers ultimately removed 113 pounds of marijuana from the van.

Morlock was charged with possession of marijuana with intent to sell and no tax stamp. Morlock filed a motion to suppress the evidence. The district court held a hearing on the motion in conjunction with a bench trial. At trial, Morlock conceded the initial stop was proper, but he argued his detention was not reasonably related to the scope of the stop. The State argued that the encounter became voluntary after Cocking returned the documents to Morlock, and even if the encounter was not voluntary, Cocking had reasonable suspicion of criminal activity to support further investigation after the purpose of the traffic stop was completed.

After hearing the evidence, the district court found that the encounter between Cocking and Morlock was continuous and never

became voluntary. However, the district court found that Cocking articulated reasonable suspicion of criminal activity to continue the investigation after the purpose of the traffic stop was completed. Thereafter, the district court found that Morlock voluntarily consented to the search of the van. The district court overruled Morlock's motion to suppress the evidence and found him guilty as charged. Morlock timely appeals.

Morlock claims the district court erred in denying his motion to suppress the evidence. Specifically, Morlock claims Cocking violated his rights under the Fourth Amendment to the United States Constitution to be free of unreasonable searches and seizures by asking questions of Morlock and O'Kelly about their travel plans which were unrelated to the purpose and the scope of the traffic stop. Morlock also claims that Cocking exceeded the reasonable scope and duration of the traffic stop when he ran a warrant check on Morlock's driver's license without reasonable suspicion of criminal activity. Under the circumstances, Morlock claims that he was unlawfully detained and Cocking did not receive a voluntary consent to search the van.

The State contends that Cocking asked Morlock and O'Kelly routine questions about their travel plans during a valid traffic stop. The State contends that after the stop concluded, the encounter became voluntary, and Morlock consented to a search of his van. The State argues that even if the encounter did not become voluntary, Cocking had reasonable suspicion of criminal activity to extend the duration of the traffic stop.

*Burden of proof and standard of review*

The State has the burden of proving that a search and seizure was lawful. K.S.A. 22-3216(2); *State v. Anderson,* 281 Kan. 896, 901, 136 P.3d 406 (2006). In reviewing a district court's decision regarding the suppression of evidence, an appellate court reviews the factual underpinnings by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. An appellate court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts

in the evidence. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006).

When the material facts to the district court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006). Here, Cocking was the only witness who testified on the suppression issue and his testimony was undisputed. At the end of the hearing, the district court was not required to weigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. The district court's determination that Cocking articulated reasonable suspicion of criminal activity was a legal conclusion drawn from the evidence which is subject to this court's unlimited review. *State v. Moore*, 283 Kan. 344, 350, 154 P.3d 1 (2007). An appellate court does not give deference to the district court's judgment on questions of law. *State v. Hicks*, 282 Kan. 599, 608, 147 P.3d 1076 (2006).

### Questioning about travel plans

Morlock claims it was impermissible for Cocking to ask him and his son about their travel plans. He claims the questions were unrelated to the purpose of the traffic stop. He further claims the questions exceeded the reasonable scope of his detention and violated his Fourth Amendment right to be free of unreasonable searches and seizures.

We begin our analysis by examining the applicable constitutional provisions. The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures" of "persons." Section 15 of the Kansas Constitution Bill of Rights provides protection identical to that provided under the Fourth Amendment to the United States Constitution. "[T]he wording and scope of the two sections are identical for all practical purposes. If conduct is prohibited by one it is prohibited by the other." *State v. Johnson*, 253 Kan. 356, 362, 856 P.2d 134 (1993).

A routine traffic stop is a seizure under the Fourth Amendment. *State v. McKeown*, 249 Kan. 506, 510, 819 P.2d 644 (1991). The seizure resulting from a traffic stop is generally analyzed as an

investigatory detention. As a result, courts examine the reasonableness of a traffic stop under the principles set forth in *Terry v. Ohio*, 392 U.S. 1, 18, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). These principles are codified at K.S.A. 22-2402(1), which provides:

"Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand the name, address of such suspect, and *an explanation of such suspect's actions*." (Emphasis added.)

The State's response to Morlock's argument is straightforward. K.S.A. 22-2402(1) specifically provides that during an investigatory detention, a law enforcement officer may request an explanation of the suspect's actions. The State claims this statute expressly authorizes a law enforcement officer to question a suspect about his or her travel plans during a traffic stop.

We disagree with the State's reliance on K.S.A. 22-2402(1) to justify Cocking's questioning about travel plans. Although a routine traffic stop is akin to an investigatory detention, there is an important difference. In a traffic stop, the law enforcement officer usually stops the motorist for a particular reason, *i.e.*, to issue a citation for an observed traffic offense. The law provides that such a stop must be minimally intrusive, diligently pursued, and reasonably related in scope to the circumstances which justified the initial interference. *United States v. Sharpe*, 470 U.S. 675, 682, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985). Issuing a traffic citation generally does not require the law enforcement officer to demand an explanation of the motorist's actions.

The Kansas Supreme Court has previously described the reasonable scope of a routine traffic stop:

"A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he or she is entitled to operate the car, the driver must be allowed to proceed on his or her way, without being subject to further delay by the officer for additional questioning." *State v. Mitchell*, 265 Kan. 238, 245, 960 P.2d 200 (1998).

The Kansas Supreme Court has further indicated that when the original purpose of a traffic stop has been completed, further questioning is permissible only if (1) the encounter between the officer

and the driver ceases to be a detention, but becomes consensual, and the driver voluntarily consents to additional questioning, or (2) during the traffic stop the officer gains a reasonable and articulable suspicion that the driver is engaged in illegal activity. *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998).

Kansas courts have never explicitly addressed whether a law enforcement officer may question a detained driver or a passenger about his or her travel plans without unconstitutionally extending the scope of the traffic stop. In some cases, Kansas courts have considered a detained motorist's answers to an officer's questions about travel plans to determine whether the officer developed reasonable suspicion of criminal activity to extend the traffic stop. See *State v. Moore*, 283 Kan. 344, 355, 154 P.3d 1 (2007) (officer questioned driver about travel route from Las Vegas to Maryland); *DeMarco*, 263 Kan. at 739 (officer questioned driver and passenger about purpose of trip to Los Angeles); *State v. Chapman*, 23 Kan. App. 2d 999, 1010, 939 P.2d 950 (1997) (officer questioned driver about trip from Arizona). However, these cases do not address whether it was permissible for the law enforcement officer to question a detained motorist about his or her travel plans in the first place.

Our research has uncovered a line of federal cases that hold a law enforcement officer may inquire about a detained driver's travel plans during a traffic stop without unconstitutionally extending the scope of the stop. *United States v. Betancourt*, 2008 WL 1970950, at *1 (9th Cir. 2008); *United States v. Brigham*, 382 F.3d 500, 507-08 (5th Cir. 2004); *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); *United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999), *cert. denied* 528 U.S. 1176 (2000); *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied* 528 U.S. 1161 (2000). The Tenth Circuit has directly addressed this issue multiple times and concluded that "questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop." *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001); see *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006); *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005); *United States v. West*, 219 F.3d 1171, 1176

(10th Cir. 2000). Although courts have held that questions about travel plans generally fall within the scope of a traffic stop, courts have also held that a citizen is not legally obligated to answer such routine questions and that an officer cannot compel an answer to these questions. See *Williams*, 271 F.3d at 1267.

State courts have similarly held that during a routine traffic stop a law enforcement officer may ask a detained driver about his or her travel plans. See *Caldwell v. State*, 780 A.2d 1037, 1049 (Del. 2001) (relying on statute that allowed officers to question detained motorists on destination); *Woodard v. State*, 289 Ga. App. 643, 647, 658 S.E.2d 129 (2008); *State v. Ramirez*, 2008 WL 2357707, at *3 (Idaho App. 2008); *People v. Williams*, 472 Mich. 308, 315-16, 696 N.W.2d 636 (2005); *Tyler v. Kyler*, 15 Neb. App. 939, 944, 739 N.W.2d 463 (2007); *State v. Baum*, 393 N.J. Super. 275, 286-87, 923 A.2d 276 (2007); *State v. Carlson*, 102 Ohio App. 3d 585, 596-98, 657 N.E.2d 591(1995); *Marinaro v. State*, 163 P.3d 833, 835 (Wyo. 2007).

In many of the cases that permit a law enforcement officer to question a driver about travel plans, the facts were limited to questions concerning the driver's place of departure or destination. However, in some of the cases the scope of the permissible questioning was much broader. See *Brigham*, 382 F.3d at 507-08 (officer permitted to ask about the purpose and itinerary of a driver's trip); *Bradford*, 423 F.3d at 1153 (when motorist responded that she was returning from a family reunion, officer was permitted to ask how long her family reunion had lasted and where it was held); *Baum*, 393 N.J. Super. at 286-87 (officer may ask routine questions of the vehicle's occupants, such as where they are going and coming from, and for what purpose); *Carlson*, 102 Ohio App. 3d at 597-98 (officer permitted to ask motorist why she had left California and why her boyfriend had not accompanied her on the trip).

Although courts have uniformly held that a law enforcement officer may question the *driver* of a vehicle about travel plans, there is limited authority upholding such questioning of *passengers*. See *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005); *Tyler*, 15 Neb. App. at 944; *People v. Bunch*, 207 Ill. 2d 7, 796 N.E.2d 1024 (2003). However, the court in *Muriel* believed that *Terry* stop

limitations were not applicable where the stop was based on probable cause rather than reasonable suspicion. 418 F.3d at 724. In *Tyler*, the court held that the defendant was no longer in the vehicle at the time of the encounter and therefore not subject to the "investigatory authority flowing from an observed traffic violation." 15 Neb. App. at 945. Finally, in *Bunch*, the court concluded that passenger questioning as to travel plans after the stop was concluded unreasonably prolonged the passenger's detention and required suppression of the evidence. 207 Ill. 2d at 15-20.

In summary, the cases from other jurisdictions hold that during a routine traffic stop, a law enforcement officer may question the driver about his or her travel plans provided that the questioning is reasonably related to the scope of the traffic stop and the questioning does not unreasonably alter the nature or the duration of the stop. Courts further emphasize that a citizen is not legally obligated to answer routine questions about travel plans and that an officer cannot compel an answer to these questions.

In a letter of additional authority, the State has cited *Muehler v. Mena*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005), for the proposition that during a lawful detention, a law enforcement officer may question a suspect about matters unrelated to the detention. In *Mena*, the respondent and others were detained in handcuffs for 2 to 3 hours during a search of the premises they occupied. During the detention, law enforcement officers questioned the respondent about her immigration status. The respondent later sued the officers under 42 U.S.C. § 1983 claiming she had been detained in violation of her Fourth Amendment rights. The district court found in the defendant's favor, and the Ninth Circuit Court of Appeals affirmed.

The United States Supreme Court reversed and held that the respondent's detention in handcuffs for the length of the search did not violate the Fourth Amendment. 544 U.S. at 98-100. The Court also held that the officers' questioning of the respondent, during the lawful detention, about her immigration status did not constitute an independent Fourth Amendment violation because mere police questioning did not constitute a seizure and there was

no evidence that the questioning prolonged the detention. 544 U.S. at 101.

The State argues that based upon *Mena,* a law enforcement officer may question a detained motorist about matters unrelated to the traffic stop, including the motorist's travel plans, without violating the motorist's constitutional rights. We disagree that the Court's analysis in *Mena* readily applies to a traffic stop case. As previously stated, in a traffic stop the law enforcement officer usually stops the motorist for a particular reason, *i.e.,* to issue a traffic citation for an observed traffic infraction. We do not believe that *Mena* overrules the longstanding federal and state precedent that a traffic stop must be reasonably related in scope and duration to the circumstances which justified the initial interference. In fact, the Kansas Supreme Court has recently held that *Mena* does not alter the general rule that a law enforcement officer violates the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights by asking a passenger in a vehicle stopped for a traffic violation, while the driver and the passenger are still being detained, to consent to a search that is unrelated to the purpose of the stop. *State v. Smith,* 286 Kan. 402, Syl. ¶ 2, 184 P.3d 890 (2008). To the extent that other courts have relied on *Mena* to allow law enforcement questioning about matters unrelated to the stop, we believe such analysis is not in keeping with our Supreme Court's distinction of *Mena* in *Smith.* 286 Kan. at 402-03.

Returning to our facts, Cocking initially stopped the van when he noticed O'Kelly failed to signal two different times when changing lanes. The parties do not dispute that a traffic infraction provides an objectively valid reason to effectuate a stop. *Moore,* 283 Kan. at 350. After the stop, Cocking asked O'Kelly to step out of the vehicle. Kansas courts have recognized that a law enforcement officer may, even without suspicion of additional crimes, order a driver to exit a vehicle when the vehicle is lawfully stopped for a traffic violation. *State v. Schneider,* 32 Kan. App. 2d 258, 263, 80 P.3d 1184 (2003); see *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977).

When Cocking and O'Kelly walked to the rear of the van, Cocking asked O'Kelly whether the information on his driver's license was correct. Cocking also asked O'Kelly: (1) where he was traveling from; (2) how long he had been in Phoenix; and (3) what he was doing in Phoenix. After O'Kelly informed Cocking that Morlock was his father and the person who rented the van, Cocking asked Morlock to produce the rental agreement. Cocking also asked Morlock: (1) where he was going and coming from; (2) how long he had been in Phoenix; (3) why he went to Phoenix; (4) why he rented the vehicle from Tucson when he was visiting Phoenix; and (5) why he flew to Phoenix but was driving back. Cocking then took both driver's licenses and the rental agreement to his patrol vehicle.

We are persuaded by the substantial legal authority from other jurisdictions that Cocking was permitted to ask O'Kelly where he was traveling from. This routine question was reasonably related to the scope of the traffic stop, and the inquiry did not unreasonably alter the nature or the duration of the stop. Although the question was not directly related to the original reason for the stop, *i.e.*, failing to signal when changing lanes, the question allowed Cocking to determine if O'Kelly was on the proper course, and the question did not unreasonably delay O'Kelly or infringe upon his rights.

However, we disagree with the State that Cocking was permitted to ask O'Kelly how long he had been in Phoenix and what he was doing there. We acknowledge that similar questioning has been upheld by courts in other jurisdictions. However, we conclude these were not routine questions about O'Kelly's travel plans, and the questions were not reasonably related to the scope of the traffic stop. Instead, the questions were designed to allow Cocking to probe into O'Kelly's personal business in the hope of uncovering suspicious activity.

Such an intrusion cannot be justified by reasoning that the motorist is not legally obligated to answer the questions. This analysis blurs the distinction between a voluntary encounter and a traffic stop, which is an investigatory detention. In a voluntary encounter, a law enforcement officer may approach an individual and ask questions without constituting a seizure provided the individual is

free to leave, but the officer cannot force the individual to answer. *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 11 S. Ct. 2382 (1991); *McKeown*, 249 Kan. at 509. However, a traffic stop constitutes a seizure, and the motorist is not free to leave while he or she is being temporarily detained and questioned. The motorist is not allowed to pick and choose which questions must be answered. Until the law enforcement officer conveys to the motorist that he or she is free to refuse the requests or otherwise end the encounter, the motorist is expected to cooperate with the investigation and to answer all questions posed by the law enforcement officer. This is why it is essential that law enforcement questioning during a traffic stop be reasonably related in scope to the circumstances which justified the initial interference.

Once O'Kelly indicated to Cocking that his father had rented the van, it was reasonable for Cocking to approach Morlock and ask for information. Cocking was certainly entitled to ask Morlock to produce the rental agreement, as this document established that Morlock was authorized to possess the van in lieu of a vehicle registration. While Morlock was looking for the rental agreement, Cocking asked him where he was going and coming from. Morlock said he was coming from Phoenix to Kansas City. When Cocking determined that the vehicle was rented from Tucson and not from Phoenix, Cocking asked Morlock about this discrepancy.

We conclude that these routine questions were reasonably related to the scope of the traffic stop, and the questions did not unreasonably alter the nature or the duration of the stop. Cocking asked the initial question about where Morlock was going and coming from while Morlock was looking for the rental agreement, so the question caused no additional delay. When Cocking examined the rental agreement and discovered the van was rented from Tucson and not from Phoenix, Cocking was entitled to ask a follow-up question about the discrepancy.

However, we conclude that Cocking had no authority to ask Morlock how long he had been in Phoenix, why he went to Phoenix, and why he flew to Phoenix but was driving back. We do not believe these were routine questions about Morlock's travel plans, especially in light of the fact that Morlock was the passenger and

not the driver of the vehicle. Although the questions did not unreasonably alter the nature or the duration of the stop, we find that the questions were not reasonably related to the scope of the traffic stop and were designed solely to uncover suspicious activity.

In summary, under the circumstances of this case, some of Cocking's routine questions of Morlock and O'Kelly about their travel plans were reasonably related to the scope of the traffic stop, and the inquiries did not unreasonably alter the nature or the duration of the stop. However, some of the questions were improper. Specifically, Cocking had no authority to ask O'Kelly how long he had been in Phoenix and what he was doing in there. Cocking also had no authority to ask Morlock how long he had been in Phoenix, why he went to Phoenix, and why he flew to Phoenix but was driving back. We conclude these questions were not reasonably related in scope to the traffic infraction which justified the stop in the first place.

### Warrant check on passenger

Morlock also claims that Cocking violated his constitutional rights by seizing his driver's license and running a warrant check without reasonable suspicion of criminal activity. Morlock claims that Cocking's action exceeded the reasonable scope and duration of the traffic stop and subjected Morlock to an unlawful detention.

The reasonable scope of a law enforcement officer's investigation during a routine traffic stop differs somewhat as it relates to the driver of the vehicle as opposed to the passengers. While a law enforcement officer may demand that the driver produce his or her driver's license and vehicle registration in order to run a warrant check on the driver, the Kansas Supreme Court has held that the seizure of a passenger for identification and a records check constitutes an unreasonable detention, in the absence of reasonable suspicion of criminal activity. *State v. Damm*, 246 Kan. 220, 224-25, 787 P.2d 1185 (1990).

In *Damm*, a law enforcement officer stopped the defendant's vehicle because of defective taillights. The officer gathered the driver's licenses from the defendant and his two passengers and returned to the patrol car to perform a routine records check. The

officer discovered an outstanding warrant on one of the passengers, who was then arrested and placed in the patrol car. The officer then searched the defendant's vehicle incident to the passenger's arrest. After discovering drug paraphernalia and cocaine in the vehicle, all three occupants were arrested for drug possession. The district court suppressed the evidence and discharged the defendant.

On appeal, the Kansas Supreme Court affirmed. The court found that the law enforcement officer had no reasonable suspicion that there were outstanding warrants for the passengers. The court held the seizure exceeded the reasonable scope and duration of the traffic stop when, in the absence of any reasonable suspicion, the passengers' licenses were taken and their records were checked. 246 Kan. at 225. As the court explained:

"While [the defendant] was properly stopped and checked for the defective tail-lights, it was improper to seize him for the amount of time it took to run a check on every passenger in the car with him. An individual is 'seized' when an officer restrains his freedom, even if the detention is brief and falls short of arrest. The Fourth and Fourteenth Amendments prohibit unreasonable seizures as well as searches. [Citations omitted.] The scope and duration of a seizure must be strictly tied to and justified by the circumstances which rendered its initiation proper. [Citation omitted.] Otherwise, the driver of a carload of people on the way to work, the driver of a vanload of people on the way to a ball game, or the driver of an intercity bus loaded with passengers, when stopped for a defective taillight, could be detained for an inordinate amount of time while the officer runs record checks on every passenger aboard." 246 Kan. at 224.

Cases from other states are in accord with the holding in *Damm.* See *St. George v. State,* 197 S.W.3d 806, 822-23 (Tex. App. 2006) (warrant check on passenger is not routine and necessary part of traffic stop); *State v. Johnson,* 805 P.2d 761, 764 (Utah 1991) (detention of passenger to run warrant check was not justified by articulable suspicion of crime and violated passenger's Fourth Amendment rights). But see *People v. Harris,* 228 Ill. 2d 222, 237, 886 N.E.2d 947 (2008) (running warrant check on passenger in car stopped for making illegal turn did not violate Fourth Amendment); *State v. Rubio,* 136 P.3d 1022, 1028-29 (N.M. App. 2006) (officer's request for identification from passenger who was' owner

of vehicle and subsequent computer check based on identification were lawful).

In *Illinois v. Caballes,* 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005), a state trooper stopped the respondent for speeding. When the trooper radioed the dispatcher to report the stop, a second trooper overheard the transmission and drove to the scene with a narcotics-detection dog. While the first trooper was writing a warning ticket, the second trooper walked the dog around the car, and the dog alerted at the trunk. The troopers searched the trunk and found marijuana. The entire incident lasted less than 10 minutes. The Illinois Supreme Court suppressed the evidence and held, in part, that the use of the dog unjustifiably enlarged the scope of a routine traffic stop into a drug investigation.

On certiorari, the United States Supreme Court vacated and remanded. The Court noted that the initial seizure was lawful and the duration of the stop was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop. 543 U.S. at 407-08. The court held that the intrusion on the respondent's privacy expectations caused by the dog sniff did not rise to the level of a constitutionally cognizable infringement. 543 U.S. at 409.

We do not believe the holding in *Caballes* diminishes the precedent of *Damm.* The facts of the two cases are clearly distinguishable. In *Caballes,* there was no evidence that the drug sniff extended the duration of the traffic stop at all, but here it is evident that the warrant check on Morlock extended the duration of the traffic stop to at least some degree. Furthermore, Morlock is not arguing that the warrant check infringed upon his privacy interest, which was the focus of the court's decision in *Caballes.* The majority decision in *Caballes* did not discuss *Terry* or the scope of a *Terry* stop. As a result, our Supreme Court has been explicit that *Caballes* is to be read narrowly in Kansas, and that it has no general application to *Terry* stops in Kansas. *Smith,* 286 Kan. at 419.

Returning to our facts, even if Cocking violated no rights by questioning Morlock and O'Kelly about their travel plans, Cocking's investigation went off course when he seized Morlock's driver's license and returned to his patrol vehicle to run a warrant check' not only on O'Kelly, the driver, but on Morlock as well. In

*Damm,* the Kansas Supreme Court makes it clear that during a routine traffic stop, a law enforcement officer may not request a passenger's driver's license and run a warrant check on the passenger in the absence of any reasonable suspicion of criminal activity. It appears that neither party cited *Damm* in the district court, and the district court did not analyze the holding of *Damm* in rendering its decision on the motion to suppress the evidence.

During the hearing on the motion to suppress, Cocking never explained why he ran a warrant check on Morlock, the passenger, during the course of his investigation. Cocking testified that at the time he requested Morlock's driver's license to run the warrant check, he was somewhat suspicious about O'Kelly's nervousness, the one-way car rental and the short stay in Arizona, and the discrepancies in the information he received about Morlock's travel plans. Cocking also thought the amount of luggage was suspicious, but this was after he had already seized Morlock's driver's license to run the warrant check. Other than those factors, Cocking admitted that he had no reasonable suspicion of criminal activity other than O'Kelly's failure to signal when changing lanes. In fact, during cross-examination, Cocking acknowledged that he had to let Morlock and O'Kelly go when he handed back the ticket, and he could not detain them to search the van without their consent.

The State argues on appeal, as the district court found, that Cocking articulated reasonable suspicion of criminal activity to continue the investigation after the purpose of the traffic stop was completed. In *DeMarco,* the Kansas Supreme Court, quoting the United States Supreme Court, defined reasonable suspicion as " ' "a particularized and objective basis for suspecting the person stopped of criminal activity. [Citation omitted.] Something more than an unparticularized suspicion or hunch must be articulated." ' " 263 Kan. at 735. Nervousness alone is not sufficient to justify further detention; however, in combination with other suspicious circumstances, it might contribute to a finding of articulable suspicion. 263 Kan. at 737. Furthermore, the use of a rental car for a short-term trip has been identified as a factor supporting reasonable suspicion. *Moore,* 283 Kan. at 355; *DeMarco,* 263 Kan. at 735-41. Also, discrepancies in travel plans have been used as objective

reasonable suspicion factors in some cases. *Moore*, 283 Kan. at 355; *DeMarco*, 263 Kan. at 739. As we have concluded, however, much of the information Cocking received from Morlock and O'Kelly about their travel plans was based upon questioning outside the scope of the traffic stop.

Despite the presence of some factors supporting reasonable suspicion, other factors did not support any reasonable suspicion of criminal activity on Morlock's part. Cocking had no reason to believe there might be an outstanding warrant for Morlock. Cocking had not been advised by dispatch that the van was suspected of transporting drugs. Cocking did not recognize Morlock from any previous contact, nor did he have any personal knowledge of him. Cocking had not observed the van stop at any location that was known for illegal drug activity.

Cocking testified he never observed any drugs, drug paraphernalia, weapons, or alcohol containers inside the van. Cocking also testified he never smelled an odor of alcohol or marijuana, nor did he smell any air freshener, fabric softener, coffee grounds, or anything else that could mask the odor of drugs. Morlock did not seem impaired, and he did not provide any statements to Cocking which would give rise to the suspicion of criminal activity. For the most part, the information Cocking received from Morlock and O'Kelly about their travel plans was consistent. As for the amount of luggage, four bags for two passengers traveling from Kansas City to Arizona and back does not seem that unusual.

Basically, Cocking had a rental van from Arizona with a nervous 16-year-old driver. Cocking may have had a hunch that Morlock and O'Kelly were up to something, which later proved to be correct, but there was simply no particularized and objective evidence to support a reasonable suspicion of criminal activity. Although Cocking's narcotics-detection dog was in the back of his patrol vehicle, Cocking's suspicion never reached the point that Cocking employed the trained animal to sniff for the presence of drugs. Instead, Cocking ultimately asked Morlock for his consent to search the van.

Based upon the totality of the circumstances, we conclude that Cocking lacked reasonable suspicion of criminal activity at the time

Cocking requested Morlock's driver's license to run a warrant check. Thus, Cocking's action in this regard unreasonably extended the scope and duration of the traffic stop and violated Morlock's constitutional rights pursuant to *Damm*.

### Did consent remove the taint?

Ultimately, Morlock consented to Cocking's search of the van which led to the discovery of the marijuana. On appeal, Morlock claims that his consent was not voluntary because he was subjected to an unlawful detention at the time the consent was given. The State contends that after Cocking returned the documents to Morlock, the traffic stop ended and Morlock consented to additional questioning, relying on *State v. Thompson*, 284 Kan. 763, 166 P.3d 1015 (2007).

*Thompson* holds that an initial traffic stop can subsequently become a consensual encounter if, under the totality of the circumstances, the law enforcement officer's conduct conveys to a reasonable person that he or she is free to refuse the requests or otherwise end the encounter. 284 Kan. 763, Syl. ¶ 9. However, *Thompson* is distinguishable from the present case because at the point of requesting consent in *Thompson*, there had been no "taint" of the encounter. Here, as we have concluded, Morlock's constitutional rights were violated when Cocking asked impermissible questions about travel plans and when he ran the warrant check on Morlock.

Once the encounter is tainted, the focus must be on whether the consent *purged* the taint. *State v. Grace*, 28 Kan. App. 2d 452, Syl. ¶¶ 6-8, 17 P.3d 951, *rev. denied* 271 Kan. 1039 (2001). The analysis requires consideration of the proximity in time of the violation and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the law enforcement officer's misconduct. Most importantly, the State must establish a break in the causal connection between the illegality and the evidence thereby obtained. 28 Kan. App. 2d at 460; see *State v. Rice*, 264 Kan. 232, 241-44, 955 P.2d 1258 (1998).

Here, there was a close proximity in time between the constitutional violation and Morlock's consent. There were no interven-

ing circumstances present to purge the taint of the constitutional violation. For instance, if the warrant check had uncovered an outstanding warrant for Morlock, Cocking could have arrested Morlock on the warrant even though the information was illegally obtained. See *State v. Martin,* 285 Kan. 994, 1005, 179 P.3d 457 (2008). However, these are not the facts of this case.

Furthermore, there was a direct causal connection between Cocking's illegal actions and evidence ultimately seized from the van. Cocking testified that by the time of his request for consent, he was suspicious of drug trafficking based in large part on the information he received about the travel plans. As we have concluded, much of the information Cocking received from Morlock and O'Kelly about their travel plans was based upon questioning outside the scope of the traffic stop. The State failed to establish a break in the causal connection between Cocking's illegal actions and the evidence thereby obtained. In fact, the district court expressly found that the encounter between Cocking and Morlock was continuous and never became voluntary.

For these reasons, we conclude there is no need to analyze the voluntariness of Morlock's consent to additional questioning and his consent to the search of the van, employing *Thompson.* We conclude that Cocking violated Morlock's constitutional rights when Cocking asked impermissible questions about travel plans and, more importantly, when he ran the warrant check on Morlock. We further conclude that the State failed to establish that Morlock's consent purged the taint of the constitutional violations. Thus, the district court erred in denying Morlock's motion to suppress the evidence. Because the evidence establishing Morlock's guilt is suppressed, Morlock's convictions are set aside, and he is discharged from further proceedings.

Reversed.

LEBEN, J., dissenting: Ronnie Morlock, a passenger in a van he had rented, claims that his Fourth Amendment rights were violated when an officer did no more than ask a handful of questions about travel plans, ask him for an ID, take the ID back briefly to a patrol car, and check by radio for outstanding warrants. Morlock concedes

that the traffic stop itself was proper, so his claim rests on the premise that an officer may not ask about travel plans or ask a passenger for ID and conduct a warrant check during a normal traffic stop. But Morlock's claim about the warrant check is precluded by recent United States Supreme Court cases interpreting the Fourth Amendment—cases that we are required to follow. And his claim that the officer couldn't ask limited questions about his travel plans is contrary both to the rationale of recent United States Supreme Court cases and to cases decided by courts elsewhere.

Moreover, even if the officer did something not allowed in a typical vehicle stop, that action would not be cause to suppress the evidence of 113 pounds of marijuana found in Morlock's van. First, the district court properly found that the officer had reasonable suspicion based on the evidence, and reasonable suspicion allows an officer to detain someone briefly to investigate possible criminal activity. Second, the officer's mistake didn't have any coercive impact on Morlock. Morlock's consent came after the officer had given sufficient indication that Morlock was free to leave by returning all paperwork, saying, "Have a nice day," and taking a couple of steps to leave. Thus, when the officer returned and asked whether Morlock would agree to talk further, Morlock's agreement—and his later agreement that the officer could search the van—was voluntary. As the search was voluntary, we shouldn't suppress the evidence against Morlock and set aside his conviction.

I. *Recent United States Supreme Court Cases Dictate That an Officer May Ask for a Passenger's ID and Run a Warrant Check During a Traffic Stop.*

The first issue is whether the officer could ask Morlock for his ID and then check for arrest warrants against him. Two key Supreme Court cases both involve traffic stops: *Illinois v. Harris*, 543 U.S. 1135, 161 L. Ed. 2d 94, 125 S. Ct. 1292 (2005); and *Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005). *Harris*, like our case, involved an officer asking a passenger for ID and running a warrant check on him. We can't say with certainty what the United States Supreme Court thought about that specific factual situation because the Court didn't issue an opinion. Instead,

the Court vacated the Illinois Supreme Court's decision that the officer had violated the Fourth Amendment, and the Court told the Illinois Supreme Court to reconsider its *Harris* decision "in light of" *Caballes*. So it would seem that *Caballes* may hold the key to our case as well.

The Illinois Supreme Court found that *Caballes* was the key to its case. And based on *Caballes*, the Illinois Supreme Court reversed its prior decision and concluded earlier this year that asking a passenger for ID and running a warrant check on the passenger did not violate the Fourth Amendment. *People v. Harris*, 228 Ill. 2d 222, 886 N.E.2d 947 (2008). To facilitate discussion of both the original Illinois decision, *People v. Harris*, 207 Ill. 2d 515, 802 N.E.2d 219 (2003), which found a Fourth Amendment violation, and the more recent decision, which did not find a violation, I will refer to the 2003 decision as *Harris I* and the 2008 decision as *Harris II*.

To put matters in context, we must start with *Harris I*. In it, the Illinois Supreme Court applied what it viewed as well-established rules for traffic stops. It applied its own cases interpreting *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), which governs how police may detain someone to investigate possible wrongdoing. Under a *Terry* stop, the Illinois court noted that the officer's actions must be "reasonably related in scope to the circumstances which justified the interference" with the person's freedom. 207 Ill. 2d at 523. The court concluded that running a warrant check on the passenger "was impermissible because it changed the fundamental nature of the traffic stop," converting it "from a routine traffic stop into an investigation of past wrongdoing by [the passenger]." 207 Ill. 2d at 528. A warrant check on the passenger could be done only if the officer had reasonable suspicion that the passenger had committed a crime. 207 Ill. 2d at 530-31.

But that decision did not stand. The United States Supreme Court set it aside and ordered reconsideration based on *Caballes*. Before considering *Harris II*, then, we should consider *Caballes*.

*Caballes* had seemed like an easy case for the Illinois Supreme Court. Its opinion began with a familiar review of *Terry* stop rules,

noting that the State had the burden to show "that the conduct remained within the scope of the stop." *People v. Caballes*, 207 Ill. 2d 504, 509, 802 N.E.2d 202 (2003). A trooper stopped a driver for speeding on an interstate highway. During the stop, a drug-interdiction team came to the scene. A police dog walked around the car; the dog alerted, and drugs were found. The legal issue seemed simple enough. The driver was stopped for speeding, but the police conducted an investigation for drugs. Was that within the scope of the stop? The Illinois court said no: "the police impermissibly broadened the scope of the traffic stop . . . into a drug investigation." The police could only broaden the scope with reasonable suspicion of drug activity. 207 Ill. 2d at 509.

But that decision did not stand, either. In a six to two decision (one justice not participating), the United States Supreme Court reversed Illinois' holding in *Caballes*. The Court said that a traffic stop could "become unlawful if it is prolonged beyond the time reasonably required to complete that mission," 543 U.S. at 407, but it accepted the state court's conclusion "that the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop." 543 U.S. at 408. For Fourth Amendment purposes, the Court next concluded that "conducting a dog sniff would not change the character" of a lawful traffic stop "unless the dog sniff itself infringed [upon the defendant's] constitutionally protected interest in privacy." 543 U.S. at 408. The Court noted that prior cases had decided that there was no legitimate interest in possessing illegal drugs, so "governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.' " 543 U.S. at 408. In sum, so long as the police officer during a lawful traffic stop does nothing *further* beyond that stop to invade protected interests, the stop remains legal even though some of the officer's actions do not directly relate to the reason for the stop. If this were not the message of *Caballes*, how else could an officer bring in a drug dog—obviously unrelated to the reason for the stop—during a traffic stop for speeding?

The Illinois Supreme Court had to determine the meaning of *Caballes* in *Harris II*. The court considered the Supreme Court's

directive to consider the case "in light of *Caballes*" to mean that it should "conduct the same type of inquiry that [the Supreme Court] applied to dog sniffs to determine whether a warrant check performed during a concededly lawful traffic stop compromises a constitutionally protected interest by revealing legitimately private information." 228 Ill. 2d at 235. Because a warrant for a person's arrest "is a matter of public record," the person "has no reasonable expectation of privacy in [that] fact." 228 Ill. 2d at 237. Thus, the Illinois court concluded that a warrant check on a passenger during a traffic stop did not violate the Fourth Amendment: "like a dog sniff, it does not reveal any legitimately private activity or information, or result in any physical contact with the individual or his property." 228 Ill. 2d at 237. As a general rule, the court concluded that "so long as the duration of the stop is not unnecessarily prolonged for the purpose of conducting the check" and the stop was otherwise lawful, "a warrant check on the occupants of a lawfully stopped vehicle" does not violate the Fourth Amendment. 228 Ill. 2d at 237.

The Illinois court also considered whether its old test for the propriety of a car stop—under which both the duration and the scope of the stop are limited—remained valid after *Caballes*. The court determined that it could not answer that question based on *Caballes* alone but that *Caballes* in combination with *Muehler v. Mena*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005), provided the answer. In *Muehler*, the Court held that law-enforcement officers could ask questions unrelated to the purpose of a search when executing a search warrant in a private residence—as long as it didn't prolong the search. The *Muehler* Court noted that " 'mere police questioning does not constitute a seizure.' " 544 U.S. at 101 (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 111 S. Ct. 2382 [1991]). The Court concluded that the officer "did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status." 544 U.S. at 101. The Illinois court noted that in both *Muehler* and *Caballes*, the Court had allowed questioning unrelated to the purpose of the encounter while a person was subject to a lawful seizure:

"In light of *Muehler*, it becomes clear that *Caballes* rejected reasoning that led to this court's adoption of the 'fundamental alteration of the nature of the stop' portion of the 'scope' prong of [our former test]. All that remains is the duration prong. During a lawful seizure, as occurred in both *Muehler* and *Caballes*, the police may ask questions unrelated to the original detention and are not required to form an independent reasonable suspicion of criminal activity before doing so. Further, the Court's reliance on *Bostick* in *Muehler* indicates that the encounter should be analyzed under *Bostick*, even when the person being questioned has already been seized. [Citation omitted.]" 228 Ill. 2d at 242-43.

The Illinois court's reading of *Caballes* and *Muehler* is consistent with that of other courts. Relying on *Caballes* or *Muehler* or both, at least six federal circuit courts of appeal and state appellate courts in five other states have concluded that an officer may ask questions during a traffic stop that don't relate to the purpose of the stop so long as the duration of the stop is not appreciably extended. See *United States v. Soriano-Jarquin*, 492 F.3d 495, 501 (4th Cir. 2007); *United States v. Martin*, 422 F.3d 597, 600 (7th Cir. 2005); *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007); *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007); *United States v. Stewart*, 473 F.3d 1265, 1267, 1269 (10th Cir. 2007); *United States v. Hernandez*, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005); *People v. Johnson*, 2007 WL 4447306, at *3 (Cal. App. 2007); *Salmeron v. State*, 280 Ga. 735, 736-39, 632 S.E.2d 645 (2006); *State v. Stewart*, 145 Idaho 641, 646-47, 181 P.3d 1249 (2008); *Pearson v. State*, 870 N.E.2d 1061, 1066 (Ind. App. 2007); *Com. v. Briggs*, 2006 WL 850667, at *4 (Va. App. 2006) (unpublished opinion); *Marinaro v. State*, 163 P.3d 833, 835 (Wyo. 2007). In *Soriano-Jarquin*, the Fourth Circuit specifically addressed whether an officer could ask a passenger for identification and concluded that asking a passenger for identification during a traffic stop did not violate the Fourth Amendment when it did not prolong the stop, citing *Muehler*. 492 F.3d at 501. In addition, the Alaska Court of Appeals agreed that the Supreme Court's recent decisions left no Fourth Amendment bar to questions unrelated to the reason for a traffic stop; it proceeded to interpret its state's constitutional prohibition on search and seizure more broadly. *Brown v. State*, 182 P.3d 624, 628-34 (Alaska App. 2008).

Surely among the questions that may be asked are, "Who are you?" and "Could I see your ID, please?" The Supreme Court has said so: "In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 185, 159 L. Ed. 2d 292, 124 S. Ct. 2451 (2004); see also *INS v. Delgado*, 466 U.S. 210, 216, 80 L. Ed. 2d 247, 104 S. Ct. 1758 (1984) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."); *United States v. Diaz-Castaneda*, 494 F.3d 1146 (9th Cir.) (held it was proper to ask a passenger for ID while detained, citing *Hiibel*), *cert. denied* 169 L. Ed. 2d 410 (2007). In *Bostick*, a case in which police boarded a bus and questioned its passengers, the Court said that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage. [Citations omitted.]" 501 U.S. at 434-35. If the officer may "ask to examine" the ID, surely the officer may follow up by actually examining it.

So the Illinois Supreme Court's decision in *Harris II* is on solid ground. An officer may ask a passenger for ID and may examine it. With the ID in hand, the officer may check for warrants as an individual has no more of a privacy interest in public records of arrest warrants than he would in contraband in a car trunk. And the Supreme Court has confirmed that the issue of whether an officer may get a passenger's ID and check for warrants should be based on *Caballes*. That Court vacated the decision in *Harris I*, which found that checking a passenger's ID for warrants violated the Fourth Amendment. And that Court told the Illinois Supreme Court to reconsider the matter "in light of" *Caballes*. Based upon the United States Supreme Court's interpretation of the Fourth Amendment, an officer may ask a passenger for ID and run a warrant check on the passenger as long as that does not substantially extend the duration of the traffic stop.

The duration of this stop was not extended substantially by asking for Morlock's ID and checking for warrants on him. The officer

began the stop by approaching Morlock's son, Ronald O'Kelly, who was driving. After talking with O'Kelly, the officer spoke with Morlock. The officer then took the rental agreement and the parties' licenses back to his patrol car. Up to this point, the duration of the traffic stop was less than 3 minutes. The officer then walked back to his patrol car, wrote a warning citation for O'Kelly, and ran both names through a warrant check. The officer returned to the stopped car about 8½ minutes after he had left. Within moments, he handed the documents back to Morlock, stepped back, and said, "Have a nice day." In total, the traffic stop took about 12 minutes to that point. Within those 12 minutes, the time needed to take Morlock's ID and run his warrant check was negligible as O'Kelly was being checked too.

The United States Court of Appeals for the Tenth Circuit has found traffic stops of up to 19 minutes within a reasonable duration under the Fourth Amendment. *E.g.*, *United States v. Patterson*, 472 F.3d 767, 776-77 (10th Cir. 2006) (a traffic stop of 13 minutes for the officer to ask the driver and the passenger about their travel plans, explain speeding infraction, check license and registration, fill out citation, and check for warrants was reasonable in duration); *United States v. Briseno*, 163 Fed. Appx. 658 (10th Cir. 2006) (a traffic stop of 19 minutes to ask the driver and the passenger about their travel plans, fill out the citation, and check warrants with dispatcher was reasonable in duration); see also *Hernandez*, 418 F.3d at 1212 n.7 ("Where at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than 17 minutes can ever be unconstitutional on account of its duration: the detention is too short."). The 12-minute duration of Morlock's stop did not violate the Fourth Amendment's prohibition on unreasonable seizures.

II. *Recent United States Supreme Court Cases Strongly Indicate that an Officer May Ask Questions About Travel Plans During a Traffic Stop so Long as It Doesn't Unduly Extend the Duration of the Stop.*

Morlock also complains that the officer shouldn't have been allowed to ask him about his travel plans. Morlock argues that this

unnecessarily extended the duration of his traffic stop. But his claims once again seem to run counter to recent decisions of the United States Supreme Court, including *Caballes* and *Muehler*.

The *Caballes* decision by itself has led the authors of the leading treatise on Fourth Amendment law to change their view about both travel-plan questions and drug-dog sniffs. Before *Caballes*, those authors argued as of 2004 that drug-dog sniffs and questions about travel plans were similarly forbidden during a car stop in which an officer has no reasonable suspicion of drug activities: "[T]he officer may not question the vehicle occupants about drugs, may not quiz them about the details of their past and pending travels, may not seek a consent to search the vehicle for drugs, and may not lead a drug-sniffing dog around the stopped vehicle." LaFave, Israel & King, Criminal Procedure § 3.8(b) (Hornbook Series, 4th ed. 2004). After the Supreme Court's 2005 rejection of their position that dog sniffs were illegal absent reasonable suspicion, the chastened authors dropped their claim that an officer could not ask about travel plans. Their book supplement removed the previous text and now notes that *Caballes* "severely weakened the 'scope'/ 'intrusiveness' limitation by holding that an investigative technique, even when directed toward criminality not reasonably suspected, does not violate that limitation unless the particular tactic employed 'itself infringed [the detainee's] constitutionally protected interest in privacy,' i.e., was itself a search." LaFave, Israel & King, § 3.8(b) (Hornbook Series, 2007 Supp.).

Most courts that have recently addressed whether questions may be asked about travel plans have focused on *Muehler*'s impact, probably because its facts dealt with police questioning rather than the use of drug dogs. In *Muehler*, the Court held that law-enforcement officers could ask questions unrelated to the purpose of a search when executing a search warrant in a private residence. Perhaps no place has as much constitutional protection as one's home, and the person in *Muehler* was restrained in handcuffs while questioned. Most courts have concluded that the Court's analysis in *Muehler* is fully applicable to a person questioned during a police stop of a motor vehicle. See *Mendez*, 476 F.3d at 1080 (concluding that *Muehler*'s "reasoning is equally applicable in the traffic stop

context"); *United States v. Hernandez,* 418 F.3d at 1209 n.3 (concluding that *Muehler's* "focus on duration [and not scope of questioning] is just as applicable to a lawful traffic stop"); *Harris,* 228 Ill. 2d at 243 (concluding that the applicability of *Muehler* to a traffic stop "cannot be questioned").

Accordingly, an officer may ask questions during a traffic stop that don't relate to the purpose of the stop so long as the duration of the stop is not appreciably extended. Courts adopting this view so far and citing *Muehler* include the United States Courts of Appeal for the Fourth Circuit, *Soriano-Jarquin,* 492 F.3d at 501; the Eighth Circuit, *Olivera-Mendez,* 484 F.3d at 510-11; the Ninth Circuit, *Mendez,* 476 F.3d at 1080-81; and the Tenth Circuit, *Stewart,* 473 F.3d at 1267, 1269; as well as state appellate courts in Idaho, *Stewart,* 145 Idaho at 646-47; Illinois, *Harris,* 228 Ill. 2d at 242-43; Indiana, *Pearson,* 870 N.E.2d at 1066; Virginia, *Briggs,* 2006 WL 850667, at *4; and Wyoming, *Marinaro,* 163 P.3d at 835; see also *Martin,* 422 F.3d at 600-02 (citing *Caballes*).

If these courts are right, then officers do not violate the Fourth Amendment by asking questions unrelated to the reason for the stop so long as its duration is not extended. And if that's the case, then the officer's brief questions for Morlock and his son present no Fourth Amendment problem; the questions did not appreciably extend the duration of this very brief traffic stop. The portion of the stop during which all of the questions were asked took less than 3 minutes and also included the time for the officer to (1) walk up to the van, (2) approach O'Kelly, (3) have O'Kelly step out of the vehicle, (4) explain the reason for the stop, (5) ask O'Kelly for his ID and the registration, (6) learn the van was a rental, (7) approach Morlock, (8) ask Morlock for the rental agreement, and (9) wait for Morlock to find the rental agreement. These actions are all clearly within the scope of permissible conduct under the Fourth Amendment even under the defendant's arguments.

III. *Even Under Traditional Rules, the Officer's Actions with Morlock Were Within the Proper Scope of a Traffic Stop.*

Most courts have focused more on *Muehler* than on *Caballes* when deciding what the limits of police conduct are during a car

stop. This is perhaps because the use of drug dogs is much less frequent than the use of questions, and *Muehler* seems to more clearly address how and whether the Fourth Amendment limits questioning. As noted, courts elsewhere have held that *Muehler's* ruling applies to car stops, so questions may be asked so long as the duration of the stop is not extended.

But the Kansas Supreme Court appears to have read *Muehler* differently. In *State v. Smith*, 286 Kan. 402, 419, 184 P.3d 890 (2008), the court said that it was "not persuaded that [*Muehler*] can be read as an alteration or abandonment of the rules regarding the limited scope of a *Terry* stop." One of the rules traditionally applied in Kansas has been that "a detention may not exceed the *scope or duration* necessary to carry out the purpose of the traffic stop." (Emphasis added.) *State v. Thompson*, 284 Kan. 763, 774, 166 P.3d 1015 (2007). The Kansas Supreme Court emphasized that *Muehler* involved the execution of a warrant that a neutral magistrate approved, *Smith*, 286 Kan. at 413-14, and that a warrant is not needed for a car stop. The court also emphasized that United States Supreme Court opinions issued shortly before *Muehler* had not suggested any change in the standard rules for the scope of a *Terry* stop. 286 Kan. at 414-19.

Before considering more carefully what the *Smith* opinion's discussion of *Muehler* may mean for Morlock's case, let's just assume for the moment that it means that the traditional scope rule for *Terry* stops still applies. Under that test, the detention "may not exceed the scope or duration necessary to carry out the purpose of the traffic stop." *Thompson*, 284 Kan. at 774. Would the officer be allowed to ask Morlock for his ID, run a warrant check, and ask limited questions about travel plans? The answer is yes because the *Terry* scope limitation was never strictly applied.

Because the Fourth Amendment prohibits only *unreasonable* searches and seizures, the balancing of divergent interests like public safety and the personal interest in being left alone often makes it difficult to establish bright-line rules, and those that exist often have exceptions. And the supposedly bright-line scope test for traffic stops is much the same; that test has never been applied in a purely literal fashion.

When a person is stopped for changing lanes without signaling, what would be the scope of the stop if only information directly related to that offense could be checked? The officer could ask whether the person knew he or she hadn't signaled when changing lanes. The officer could ask for the person's ID so that the citation could be written out to the right person. But the lane change isn't relevant to whether the car is registered in the name of the driver, whether the driver has insurance, or whether the car is even registered at all. If the scope limitation for *Terry* stops were literally applied, all of that would be off limits.

Yet it's routinely accepted that the officer may ask for vehicle registration and insurance information because the Fourth Amendment balances the public interest in checking for these items against the intrusion to the individual. This balancing act was on display in *Delaware v. Prouse*, 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979), in which the Court ruled that drivers could not be stopped purely at an officer's discretion to check for a valid driver's license and vehicle registration. But the Court recognized a state's need to ensure that only qualified drivers in qualified vehicles are on the roadways as a matter of public safety. 440 U.S. at 658-59. The Court noted that these matters may be checked upon during routine traffic stops when violations have been observed: "Vehicle stops for traffic violations occur countless times each day; and on these occasions, licenses and registration papers are subject to inspection and drivers without them will be ascertained." 440 U.S. at 659. Because these papers are subject to check in routine traffic checks, the Court found that "[t]he marginal contribution to roadway safety possibly resulting from a system of spot checks" didn't justify the intrusion when done merely at an officer's discretion. 440 U.S. at 661.

Similarly, in *New York v. Class*, 475 U.S. 106, 89 L. Ed. 2d 81, 106 S. Ct. 960 (1986), the Court held that an officer could check the vehicle identification number (VIN) during a traffic stop in part because VINs are used to check for stolen vehicles, which also are more likely to be involved in accidents. 475 U.S. at 111. But VIN's have nothing to do with the purpose of the typical traffic stop.

Thus, despite the logical limits of the scope-of-the-stop test, Kansas courts, like those in other states, have routinely held—just as *Prouse* suggests—that license and registration papers are subject to review during a typical traffic stop. *State v. Mitchell*, 265 Kan. 238, Syl. ¶ 4, 960 P.2d 200 (1998). Kansas also allows the officer to have the driver "produce[] . . . proof that he or she is entitled to operate the car." 265 Kan. 238, Syl. ¶ 4. Officer safety has nothing to do with a lane-change violation either, but the dangers inherent in traffic stops are quite real. Thus, despite the logical limits of the scope-of-the-stop test, officers are allowed to do several things in the interest of officer safety: check for warrants, *Mitchell*, 265 Kan. 238, Syl. ¶ 4 (referencing "computer checks"), remove drivers from the vehicle, *Pennsylvania v. Mimms*, 434 U.S. 106, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977), and even remove passengers from the vehicle, *Maryland v. Wilson*, 519 U.S. 408, 137 L. Ed. 2d 41, 117 S. Ct. 882 (1997), all without reasonable suspicion or probable cause to believe they are a danger. All of these activities also extend the duration of the stop, but the delay due to these functions is considered reasonable in light of the interests at stake.

Of course Morlock was not a mere passenger. He was the father of the driver, and he was the only person who claimed an ownership interest in the van. The officer certainly had a right to check the rental agreement, which is equivalent to typical registration papers. The officer could also check Morlock's ID to confirm that he was the person listed on the rental agreement. When applying the traditional *Terry* scope test, courts have agreed that an officer may seek registration information from a passenger who is the car's owner or renter. *E.g., State v. Rubio*, 136 P.3d 1022 (N.M. App. 2006) (held proper to get ID and run warrant check on passenger who was owner of vehicle); *United States v. Hunter*, 471 F.2d 6 (9th Cir. 1972) (held proper to ask passenger for ID when driver claimed ownership of car and registration showed he was not); *McKoy v. State*, 127 Md. App. 89, 101, 732 A.2d 312 (1999) (held proper to ask the passenger for ID when the officer learned the driver was not an authorized driver of the rental car); see also *United States v. Garcia*, 167 Fed. Appx. 737, 740 (10th Cir. 2006) (an officer properly obtained the rental agreement from passenger/

grandfather after stopping his 17-year-old driver/grandson as it was within the scope of the traffic stop to confirm registration and ownership of the vehicle).

The Kansas Supreme Court has recognized that an officer in a traffic stop may check the ID and run a records check of the driver as a matter of routine. In *Rubio*, the New Mexico court applied caselaw similar to our state's and noted that the owner-passenger was the person responsible for assuring that the vehicle was properly registered, insured, and for giving permission to the driver to operate the vehicle. The court concluded that the rule allowing ID and records checks of drivers should apply equally to car owners who were passengers: "No different than a minimal detention of an owner-driver for this type of inquiry, the minimal detention of the owner-passenger for these purposes was reasonable and lawful." 139 N.M. at 617.

But what about asking Morlock and his son about their travel plans and their inconsistent stories? The majority has thoroughly researched the caselaw and presented uniform authorities for the conclusion that an officer may ask about travel plans during a traffic stop. Some cases so holding rely upon *Muehler*. *E.g.*, *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006); *United States v. Betancourt*, 2008 WL 1970950, at *1 (9th Cir. 2008) (unpublished opinion); *Salmeron v. State*, 280 Ga. 735, 736, 632 S.E.2d 645 (2006); *State v. Ramirez*, 2008 WL 2357707, at *3 (Idaho App. 2008) (unpublished opinion); *Marinaro v. State*, 163 P.3d 833, 835 (Wyo. 2007). But many do not. *E.g.*, *United States v. Brigham*, 382 F.3d 500, 507-08 (5th Cir. 2004); *People v. Williams*, 472 Mich. 308, 315-16, 696 N.W.2d 636, *cert. denied* 546 U.S. 1031 (2005).

In *Williams*, the Michigan Supreme Court applied traditional *Terry* stop rules and found that an officer could ask the driver and passengers about travel plans and follow up if their statements were inconsistent. 472 Mich. at 314-16. Similarly, after an exhaustive review of the caselaw, the New Mexico Supreme Court upheld travel-plan questions of the driver and the passenger when that driver had only a handwritten bill of sale and no registration paperwork. *State v. Duran*, 138 N.M. 414, 424, 120 P.3d 836 (2005).

The court noted that these questions were asked while the officer was completing steps necessary to process the traffic stop and resulted in a minor delay at most.

In sum, courts have taken two different routes in finding that questioning about travel plans does not violate the Fourth Amendment. Some have relied upon *Muehler*, concluding that questioning during a detention does not violate the Fourth Amendment unless it unnecessarily extends the duration of the stop. Others have simply held that questions about travel plans are within the scope of a traffic stop. Courts taking both approaches have almost uniformly concluded that officers may ask about travel plans during a traffic stop. But see *State v. Gibbons*, 248 Ga. App. 859, 547 S.E.2d 679 (2001) (finding that the officer exceeded scope of stop for a seat-belt violation by asking unrelated questions, including ones about travel plans).

If *Muehler* applies to traffic stops, then questions about travel plans should not present any Fourth Amendment issue unless the traffic stop is unnecessarily extended by those questions. That certainly did not occur here. But even if *Muehler* does not apply to traffic stops, other courts have concluded that questions about traffic plans are within the scope of the stop after using the traditional test. Without relying upon *Muehler*, the majority has concluded that the officer could ask the driver and passenger where they were going to and where they were coming from but that he could not ask why they had gone to Phoenix, how long they had been in Phoenix, or why they traveled one way by air and the other by van. But several of the cases cited by the majority approved similar questioning. *E.g., Brigham*, 382 F.3d at 508 (officers may ask about purpose and itinerary of trip); *United States v. Bradford*, 423 F.3d 1149, 1153-54, 1156-57 (10th Cir. 2005) (detailed questions about travel itinerary, including questions about the people that the driver said she had visited, held within scope of traffic stop). I would approve similar questioning too so long as it does not unreasonably extend the traffic stop.

IV. *The Kansas Case of* State v. Damm *Does Not Control the Result of Morlock's Case.*

Morlock contends that his rights were violated when the officer "detain[ed] him without reasonable suspicion of a crime to ask him

questions unrelated to the stop" and by "detaining [him] for the purpose of running a check of his license." In support of his claim, he cites *State v. Damm*, 246 Kan. 220, 787 P.2d 1185 (1990). But that case is not factually similar to Morlock's. More importantly, the application of this 18-year-old precedent to Morlock's case would run afoul of several more recent United States Supreme Court decisions interpreting the Fourth Amendment.

First, *Damm* involved facts quite different from Morlock's. The defendant in *Damm* was the driver, not the passenger. The court concluded that running ID checks on all the passengers in the car exceeded the scope of a proper stop of the driver, noting that such a practice could result in a bus driver being detained while the ID's of all passengers were checked. In addition, the passengers in *Damm* had no connection to the stop; the driver was stopped for a broken taillight. While the passengers had no ownership or possessory interest in the car in *Damm*, Morlock was the renter of the van and the father of the minor driver. Even when applying traditional car-stop rules about the "scope" of the stop, other courts have allowed an ID check of a passenger who had the ownership interest in the vehicle. *E.g., Rubio*, 136 P.3d 1022; *Hunter*, 471 F.2d 6; see also *Garcia*, 167 Fed. Appx. at 740. The ruling of these courts is consistent with Kansas cases that allow an officer in a traffic stop to check the ID and run a records check of the driver as a routine part of that stop.

Second, the warrant check of a passenger in *Damm* turned up a warrant; the passenger's arrest on that warrant led directly to the discovery of drugs in the car and a criminal charge against the driver. Thus, the illegal warrant check on a passenger in *Damm* resulted in obtaining the critical evidence against the defendant driver. The warrant check on Morlock turned up nothing, had no impact in obtaining evidence against him, and occurred outside his presence.

Third, *Damm* has been superseded by too many United States Supreme Court precedents that conflict with *Damm's* holding. The most significant of these are *Caballes* and *Harris*, of course. *Harris* involved exactly the issue that Morlock presented, and the Supreme Court said to decide that issue "in light of" *Caballes*. And

the Illinois Supreme Court also found that *Muehler,* an opinion issued only 1 month after the *Harris* remand order, was significant. But there are others that also undercut the 1990 ruling in *Damm:*

- *Hiibel,* 542 U.S. 177 (2004), and *Bostick,* 501 U.S. 429 (1991), which emphasized that the officer may ask for identification without any Fourth Amendment implication. The Ninth Circuit relied upon *Hiibel* as a basis for its conclusion that an officer could ask a passenger for ID in *Diaz-Castaneda:* "The police may ask people who have legitimately been stopped for identification without conducting a Fourth Amendment search or seizure." *United States v. Diaz-Castaneda,* 494 F.3d 1146, 1152 (9th Cir. 2007) (citing *Hiibel*).
- *Wilson,* 519 U.S. 408 (1997), in which the Court ruled that an officer may routinely ask passengers to exit the vehicle during a traffic stop, just as may be done with the driver. The Fourth Circuit relied upon *Wilson* as a basis for its conclusion that an officer could ask a passenger for ID in *United States v. Soriano-Jarquin,* 492 F.3d 495, 500-01 (4th Cir. 2007). The court concluded that surely if you can make the passengers physically leave the vehicle, you can also ask their names: "If an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, [citation omitted] he may surely take the minimally intrusive step of requesting passenger identification." 492 F.3d at 500.

*Damm* is not on point: the defendant there was the driver, but Morlock was the passenger. Morlock had the ownership interest (a rental agreement) in the van; the passengers in *Damm* had no ownership interest. And the warrant check in *Damm* led directly to critical evidence, while Morlock's warrant check led nowhere. Given these factual distinctions and the apparent inconsistency between *Damm* and six later United States Supreme Court cases, *Damm* should not be applied here.

V. *The Kansas State Case of* State v. Smith *Does Not Control the Result of Morlock's Case.*

After Morlock and the State filed briefs, the Kansas Supreme Court decided *State v. Smith,* 286 Kan. 402, 184 P.3d 890 (2008).

Although *Smith* involves the search of a passenger's belongings, the holding of the court in *Smith* is quite narrow. In *Smith*, officers properly stopped a car in which Smith was a passenger. While the stop was in progress and the parties were not free to drive away, an officer asked Smith for permission to search her purse. Smith consented, and drugs were found. The holding of *Smith*, then, is that it is improper to seek a passenger's consent to search his or her personal belongings during the period of detention of a car stop when that search is not related to the reason for the stop. The *Smith* opinion did not decide whether an officer may ask a passenger for ID and run a warrant check on the passenger. Nor did it decide what questions may be asked of a passenger.

As I have already noted, the Kansas Supreme Court appears to have read *Muehler* differently in *Smith* than other courts have. But the *Smith* opinion does not discuss the *Harris* case or the United States Supreme Court's direction that whether an officer may run a warrant check on a passenger be decided "in light of" *Caballes*. And the discussion of *Caballes* in *Smith* was quite limited.

The *Smith* court did note that the two dissenting justices in *Caballes* had argued that a dog sniff for drugs was well outside the scope of a traffic stop for speeding. Indeed the dissenting justices did so; they stated their view that the majority had "diminishe[d] the Fourth Amendment's force by abandoning the second *Terry* inquiry" of whether an officer's action was reasonably related to the scope of the stop. *Caballes*, 543 U.S. at 421 (Ginsburg and Souter, JJ., dissenting). The *Smith* opinion noted that "[t]he *Caballes* majority did not disagree with or even discuss this analysis" and speculated that this was because the issue had been narrowly framed by the majority as whether the Fourth Amendment requires reasonable suspicion to use a drug-detection dog to sniff a vehicle during a legitimate traffic stop. 286 Kan. at 414. Of course, a majority opinion decides the case; it need not address every issue or argument mentioned in a dissent. *Smith* cannot be read to suggest that the comments of two dissenting justices lessen the precedential value of the six-member majority opinion.

Regardless of how the issue in *Caballes* is framed, the Court determined that the dog sniff did not violate the Fourth Amend-

ment even though the traffic stop for speeding had nothing to do with drugs. And the Court directed that whether a warrant check could be done on a passenger's ID should be decided "in light of" *Caballes.*

Technically, the *Smith* opinion is not yet a binding precedent because the court has stayed issuance of the mandate. See *State v. McGinnis,* No. 94,300, unpublished opinion filed September 15, 2006, *rev. denied* 283 Kan. 933 (2007) ("Until the Supreme Court . . . issues its mandate in the case, *Fanning* is not binding precedent."); see also *State v. Adams,* 280 Kan. 494, 504-05, 124 P.3d 19 (2005) (explaining the citation to an opinion whose mandate had not yet been issued). But *Smith's* holding certainly does not control here anyway. Morlock's detention had ended *before* the officer asked for consent to search. So unless it was improper to (1) ask Morlock for his ID and run the warrant check or (2) ask Morlock a few questions about his travel plans *and* that illegality somehow taints Morlock's consent to search the van, we have a voluntary consent during a voluntary encounter. The officer had ended the detention by returning the paperwork, saying, "Have a nice day," and briefly turning away. A consent search after the detention has ended is fine. See *State v. Thompson,* 284 Kan. 763, 810-13, 166 P.3d 1015 (2007).

The United States Supreme Court's decisions in *Caballes* and *Harris* are more on point than *Smith* for deciding Morlock's case with regard to the warrant check. And the Illinois Supreme Court's decision in *Harris* II has faithfully carried out the United States Supreme Court's directive. On the warrant-check issue, *Caballes* and *Harris* must set our path because the *Harris* case involved exactly the same issue. We must also determine whether limited questioning about travel plans is allowed, including limited but logical follow-up questions. On this issue, *Caballes, Harris,* and *Muehler* set our path, and Morlock's case follows logically down the path they have set.

VI. *Even If the Officer Did Something Improper, the Officer Had Reasonable Suspicion to Justify an Investigatory Detention of Morlock.*

The district court concluded that the entire encounter between Morlock, his son, and the officer was a continuous encounter and

not voluntary. But the district court determined that it was a proper investigatory detention because the officer had reasonable suspicion of illegal activity.

The district court did not have the benefit of the 2007 decision in *Thompson* when it determined that this was a continuous encounter, in which Morlock and O'Kelly were detained by the traffic stop and not free to leave throughout. *Thompson*'s facts were nearly identical in that the officer used emergency lights, never drew his weapon, returned the driver's license, and said, "Have a nice day," before turning away briefly and then asking if the driver would answer more questions. The Kansas Supreme Court held that a reasonable person would feel free to say no, making it a voluntary encounter at that point if the driver agreed to respond to more questions. See *Thompson*, 284 Kan. at 810-12.

But if we assume for the purpose of argument that the officer went beyond what's allowed in a routine traffic stop, then we must review the district court's determination that the officer had reasonable suspicion of illegal activity so that Morlock and O'Kelly otherwise could be detained for investigation. Reasonable suspicion is something less than probable cause and requires some objective justification; an officer must be able to articulate some specific reason for suspicion, not act merely on a hunch. *State v. Moore*, 283 Kan. 344, 354, 154 P.3d 1 (2007). *Damm* recognizes that, based upon reasonable suspicion, a passenger may be held and records checked.

So what made the officer suspicious of Morlock and O'Kelly? The officer discussed several things that might make a person suspicious: (1) O'Kelly's nervousness; (2) Morlock's looking straight ahead at the dash at the start of the encounter while the officer talked to O'Kelly; (3) the discrepancy over where the van was rented as the parties said it was from Phoenix but the rental papers showed Tucson, which is 116 miles from Phoenix; (4) the discrepancy over whether the two were visiting Morlock's girlfriend or a woman Morlock met on the Internet; (5) the discrepancy over whether they saw the woman, with O'Kelly saying they were in Phoenix "visiting his dad's girlfriend" while Morlock said they "didn't make contact with" the woman he was going to see; (6) the

likelihood of taking a one-way flight to Phoenix to visit a woman but then not make contact with her at all; (7) the van was rented; (8) the van was rented for only a one-way trip, which followed a one-way trip by air; (9) the short duration of the trip; (10) more bags in the van than would seem to be needed for a short stay; and (11) the officer's previous experience with narcotics arrests on Highway 54.

The district judge correctly noted that "any one of these factors standing alone" would not be enough to justify a detention but that they must be considered together. See *Moore*, 283 Kan. at 354. Certainly mere nervousness is not enough to give reasonable suspicion, but it may do so when combined with other factors. 283 Kan. at 355.

The officer cited several factors here that are sufficient to provide reasonable suspicion for an investigatory detention. Let's start with Morlock's strange behavior in looking straight ahead and avoiding any eye contact either with his son or the officer when that officer approached his 16-year-old son. What dad would rigorously try to avoid eye contact with the officer by only looking forward when his son had been pulled over? We're not in a contest for worst dad of the year, but that's quite suspicious. And the officer quickly learned that Morlock was O'Kelly's dad.

The inconsistencies grew in the story about travel plans as the discussion progressed, and the inconsistencies were significant. O'Kelly said that they "were visiting his dad's girlfriend" in Phoenix for a couple of days. Morlock said that they had flown one-way to Phoenix from Kansas City "to see a girl he had met on the Internet" but that they had not made contact with her while they were in Phoenix. Morlock said that he didn't have enough money to buy plane tickets back, so they rented the van. The officer found that suspicious since one-way vehicle rentals are expensive too. Then Morlock produced the rental agreement, and it showed that the van was rented in Tucson, not Phoenix.

The officer didn't know the exact distance between Phoenix and Tucson, but he knew that they were separate, large cities in Arizona. The existence of reasonable suspicion is an objective test, not a subjective one, *Moore*, 283 Kan. at 354, so we can check the

significance of this discrepancy in raising reasonable suspicion by taking judicial notice of the distance between two cities. See *Ehrsam v. Borgen*, 185 Kan. 776, 778, 347 P.2d 260 (1960). MapQuest shows a distance of 116 miles between Phoenix and Tucson and 118 miles between the cities' airports. See *Saco v. Tug Tucana Corp.*, 483 F. Supp. 2d 88, 93 n.4 (D. Mass. 2007) (taking judicial notice of geographical distances based on MapQuest data). The officer testified that he had asked why Morlock flew to Phoenix but rented the van in Tucson. Morlock told him that "he got it at the Phoenix/Tucson Airport." Morlock claimed, "It's all right there in one location, and that's where we rented the vehicle." But it's hard to explain how you can rent a van in Tucson when you were visiting Phoenix, given the 116 miles between the two cities. Morlock's explanation that it was a combined airport serving those two cities only poured gasoline on what was surely an inferno of suspicion.

The district court in an oral ruling found that the officer had reasonable suspicion to detain Morlock and O'Kelly while investigating further, citing several suspicious factors:

"While he's gathering information, he's told that the trip originated in Phoenix, and yet the real contract shows Tucson. When the defendant says, it's the Phoenix/Tucson Airport, that further arouses his suspicion.

"In talking to Mr. O'Kelly, the driver, the female friend in Phoenix is referred to as girlfriend, while Mr. Morlock, the defendant, refers to her as someone he met on the internet. So that's an inconsistency that triggers his suspicion.

"In the evidence, the deputy then learned that apparently this person was not even contacted in Phoenix, even though they traveled all the way from Kansas City to Phoenix for that stated purpose."

The district court also noted the nervousness of the driver, the one-way rental agreement, and the observation of several bags for a 2-day trip as factors supporting reasonable suspicion. The district court's conclusions are on the mark, but the story is even more suspicious when it is combined with the officer's testimony about his drug-trafficking training.

The United States Supreme Court has said that an officer's observations may be supplemented by "consideration of the modes or patterns of operation of certain kinds of lawbreakers." *United*

*States v. Cortez*, 449 U.S. 411, 418, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981). The Kansas Supreme Court has also recognized that reasonable suspicion may be based in part upon the training of law-enforcement officers combined with observations that might not seem significant to a layperson without such training. *Moore*, 283 Kan. at 359-60. The officer testified that the one-way van rental was a highly significant factor based upon his training:

"The thing about a one-way rental, is that they cost so much to rent a car and drive it one way.

"The other thing is, in all the interdiction classes that I've attended, and the KHP, Kansas Highway Patrol officers I've spent time with, they're very proficient at interdiction.

"And compounded with my experience is that, that's a way to smuggle drugs. You fly down, you go pick up—you rent a car, you pick up the drugs, and you transport it. That's definitely a warning sign that should go off in your head about interdiction, plus with all the other factors that we had in this case."

The officer, Deputy Sheriff Henry Cocking, had 15 years of experience, the last 4 as the drug-dog handler. He'd received training in drug interdiction. From that training, from reading reports for law enforcement, and from talking to other officers, he was aware that U.S. 54 leads to some major source areas for drugs in the southwest United States and that there had been quite a few drug seizures from vehicles on that highway. With the officer's drug-interdiction training and the other facts noted, he had plenty of reasonable suspicion that Morlock was transporting drugs.

To sum up the evidence leading to suspicion, then, we have a father and his 16-year-old son who are returning from Phoenix. The son has missed school to accompany his dad on a trip designed to allow his dad to visit a woman there, but they didn't make contact with her according to the father. The father and son have different stories about the woman's relationship with the dad. They flew down on a one-way ticket but didn't have enough money to buy a return flight, so they rented a van for a one-way return trip. Both father and son only mention visiting Phoenix, but the van was rented in Tucson. The father claims that they rented the van at the combined Phoenix/Tucson airport. One-way vehicle rentals are quite expensive and often indicate drug-trafficking activity, espe-

cially when the driver has flown to the location from which the vehicle was rented. In addition, two men who had been gone "a couple" of days have four bags, which the officer considered excessive and another sign of possible drug trafficking based on his training.

No reasonable person could consider all of these facts and argue against reasonable suspicion. Reasonable suspicion requires only some articulable, objective basis to believe that some criminal activity "may be afoot." The basis for suspicion must be objective, but the "level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7-10, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989). The officer referenced much here that suggested criminal activity may have been afoot.

But the defendant may argue that *some* of the facts supporting reasonable suspicion were learned through the officer's allegedly illegal conduct. Therefore, we must examine what facts might have been learned through conduct that arguably went beyond permissible limits for a traffic stop. Let's consider two different scenarios that depend upon which of the officer's actions the defendant argues is illegal.

First, if we assume that *Damm* remains good law, it was improper to run a warrant check on Morlock. Even so, it was surely proper to ask him for ID under *Hiibel* and other cases since he was the person with authority to possess the van under the rental agreement. The officer learned all of the information noted here before he ran the warrant check. Of the factors that the officer cited as suspicious, only the observation of too many bags for a short-duration trip came after the officer had obtained Morlock's license and the rental agreement. But the officer had all of the suspicious information in his possession *before* he ran the warrant checks in his patrol car, and he had a right to run a warrant check on O'Kelly and write the ticket in his patrol car anyway. So he was bound to see the bags on the return to his car whether he had Morlock's license or not. Even if the observation about excessive bags is taken out of the mix, there were sufficient grounds here for reasonable suspicion.

Second, if we assume that the officer may ask basic travel plans, but only tightly limited follow-up questions, then the officer would still have learned a great deal of the cited information. But it is truly hard to figure out how an officer could be barred from follow-up questions when the information received is so inconsistent. As the inconsistencies piled up, the officer appropriately followed up. See *People v. Williams*, 472 Mich. 308, 316, 696 N.W.2d 636 (finding no violation in asking travel-plan questions of driver and passengers, including follow-up questions) ("Implicit in the authority to ask these questions is the authority to ask follow-up questions when the initial answers given are suspicious."), *cert. denied* 546 U.S. 1031 (2005); *United States v. Garcia*, 167 Fed. Appx. 737, 740 (10th Cir. 2006) (finding no violation in asking passenger for registration papers after determining that driver could not show he was "entitled to operate the vehicle").

Nonetheless, what did the officer know just from asking destination information of both parties and reviewing the rental agreement? The majority has concluded that the officer could ask where the parties were going and where they had come from; the majority also concluded that the officer could ask a follow-up question when the rental agreement said Tucson but both Morlock and O'Kelly had mentioned only Phoenix. So, without relying on any potentially "tainted" information, the officer knew that (1) the parties had gone to Phoenix from Kansas (where the licenses showed O'Kelly and Morlock lived); (2) had rented a van in Tucson for a one-way return; (3) had flown to Phoenix one-way; (4) claimed that there was a nonexistent Phoenix/Tucson airport; and (5) had several sizeable bags in their van. Between them, Morlock and his son had a large red duffle bag, a medium black suitcase, a large black suitcase, and a medium black nylon bag. When considered along with the officer's training about drug trafficking, these facts are still sufficient for reasonable suspicion.

We can gauge the significance of the facts in Morlock's case by comparing them to other cases. In *State v. DeMarco*, 263 Kan. 727, 952 P.2d 1276 (1998), the district court concluded that the officer did not have sufficient basis for reasonable suspicion. The Kansas Supreme Court affirmed and noted that "the district judge heard

the witnesses and observed their demeanor" and that the court should not "substitute our view of the evidence for that of the district court." 263 Kan. at 741. The officer in *DeMarco* identified eight factors in support of reasonable suspicion: (1) nervousness; (2) departure from Los Angeles, a major source city for narcotics; (3) an unusual travel route; (4) travel in a rental car; (5) travel on a highway commonly used for drug trafficking; (6) a short travel period; (7) inconsistencies in how one party traveled to Los Angeles; and (8) a criminal record. The Kansas Supreme Court called it a close case but found that the inconsistent statements of how one party traveled to Los Angeles were not as marked as inconsistencies in other cases where suppression was denied. The court also discounted the use of a rental car and travel from Los Angeles. 263 Kan. at 740-41.

The inconsistencies in the travel story between O'Kelly and Morlock are far greater than those in *DeMarco*. Phoenix and Tucson are 116 miles apart; neither O'Kelly nor Morlock mentioned Tucson until the officer saw the rental agreement. Then Morlock said he rented the car at a "Phoenix/Tucson airport," but each city has its own airport. The inconsistency in *DeMarco* about travel plans only related to a prior leg of the trip and involved whether one occupant flew or drove to Los Angeles. That inconsistency pales in comparison to the ones here about the location of the trip itself, the purpose of the trip, and the actual events on this trip while in Phoenix. The discrepancy about the nonexistent Phoenix/Tucson airport *by itself* is far more significant than the discrepancy in *DeMarco*.

In close cases, our Supreme Court has deferred to the judgment of the district court, which hears the witnesses, and sometimes to the judgment of the officer when that officer has substantial experience that seems relevant. *DeMarco*, 263 Kan. at 741; *Moore*, 283 Kan. at 360; *State v. Hardyway*, 264 Kan. 451, 459-60, 958 P.2d 618 (1998). The officer in Morlock's case had been involved in narcotics investigations for more than 15 years at the time of Morlock's arrest. He had been involved in at least four major narcotics seizures on Highway 54 in the prior year, and he had specific training in drug trafficking. He said that the bags in the van were

consistent with the manner in which narcotics are generally transported and that a one-way trip by air followed by a one-way trip by car or van was often a sign of drug trafficking.

We should avoid substituting our view of the evidence for that of the district court when its decision is supported by substantial evidence. *DeMarco*, 263 Kan. at 741. Ample evidence supports the district court's conclusion here. In addition, that conclusion is supported by several decisions in similar cases. *E.g.*, *Moore*, 283 Kan. at 355-60 (reasonable suspicion found on the driver's nervousness, an odor of fabric softener, a travel route from Las Vegas to Maryland, little clothing in the car, and the car was not registered to the driver; there were no inconsistent statements between individuals because the car had only one occupant); *United States v. Powell*, 2008 WL 1989665 (10th Cir. 2008) (reasonable suspicion found on a rental car, out-of-place luggage, nervousness, and a smell of deodorizer with no statements of inconsistent travel plans); see also *DeMarco*, 263 Kan. at 738-39 (discrepancies in travel plans can contribute to reasonable suspicion); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) (dubious or inconsistent answers can contribute to reasonable suspicion); *United States v. Wood*, 106 F.3d 942, 946-47 (10th Cir. 1997) (unusual travel plan or inconsistent information can contribute to reasonable suspicion); *United States v. McRae*, 81 F.3d 1528, 1535 (10th Cir. 1996) (implausible or contradictory travel plans can contribute to reasonable suspicion).

The evidence in Morlock's case is sufficient for reasonable suspicion based on these cases. But to the extent that others consider it a close question, we should defer in this case to the judgment of the district court, which heard the evidence directly. The officer had reasonable suspicion to justify an investigatory detention of Morlock.

VII. *Even if the Officer Did Something Improper That Led to Discovery of the Marijuana, Any Taint from That Impropriety Was Attenuated by Morlock's Consent During a Later, Voluntary Encounter.*

Under the exclusionary rule, evidence is generally excluded when it has been directly obtained, or even obtained indirectly

later, as a result of a government agent's illegal conduct because that evidence is the "fruit of the poisonous tree," though this rule is subject to some exceptions. See *Nardone v. United States*, 308 U.S. 338, 341, 84 L. Ed. 307, 60 S. Ct. 266 (1939).

But what if there is no causal connection at all between the unlawful conduct and the challenged evidence? Logically, there is no fruit of the poisonous tree to exclude from evidence, and that's largely our case.

Once again, we must separately consider the actions of the officer that Morlock claims were improper. The warrant check did not lead to any fruit, poisonous or otherwise. The warrant check came back negative, and there's no evidence the officer told Morlock about it. Moreover, that check did not delay Morlock at all—unless we are to assume that Morlock was going to leave his 16-year-old son alone on a highway, with or without the van, while the officer wrote out the son's ticket and lawfully checked for warrants on the son. Morlock certainly did not present evidence or argue that he was going to leave while the stop of his son was in progress. With no "fruit of the poisonous tree," there's no logical basis to exclude any evidence. As the Kansas Supreme Court recently noted, the exclusionary rule bars the admission of evidence obtained "as a result of" the illegal conduct. *State v. Poulton*, 286 Kan. 1, Syl. ¶ 2, 179 P.3d 1145 (2008); see also *Segura v. United States*, 468 U.S. 796, 813-16, 82 L. Ed. 2d 599, 104 S. Ct. 3380 (1984) (holding that the initial illegal entry of the premises did not require the suppression of evidence later obtained in the execution of the search warrant because the warrant affidavit was based only on the information obtained before the illegal entry); *Hudspeth v. State*, 349 Ark. 315, 321-22, 78 S.W.3d 99 (2002) ("It is well established that only evidence that is discovered by exploitation of an illegality can be suppressed as 'fruit' of the poisonous tree."). Simply, the evidence found in the luggage was not found "as a result" of any illegal police conduct and may not be suppressed based on the warrant check.

So what about the travel-plan questions that Morlock also complains about? In my view, of course, the officer had reasonable suspicion to detain Morlock to investigate possible criminal activity

based even on the information obtained through questions the majority opinion approves. But let's assume for purposes of this discussion that the officer didn't have reasonable suspicion without resorting to the information obtained through questions that the majority finds improper.

What then was the causal connection between those additional questions and Morlock's consent to search the car? Perhaps they led to the officer asking for consent to search the van. It seems much more likely, though, that this officer trained in drug interdiction would have asked permission for a consent search at the end of the traffic stop based only on the information the majority concedes he obtained with proper questions. If so, then the few extra questions and additional information had no impact on the situation, thus producing no fruit. If there's doubt about my conclusion that the officer would have asked permission for a consent search of the van without regard to the tainted extra information, the proper course would be to remand to the district court to determine that factual question from the evidence it heard. See *Murray v. United States*, 487 U.S. 533, 542-44, 101 L. Ed. 2d 472, 108 S. Ct. 2529 (1988) (remanding to determine whether request for search warrant was motivated by illegally obtained information or by other, lawfully obtained information) (plurality opinion).

For argument's sake, though, let's assume that the officer decided to seek consent to search the van at least in part based on the information he learned from improper questioning. Now there is "but for" causation: but for the tainted information, the officer wouldn't have sought consent to search the van, which led to the challenged evidence. But the exclusionary rule is primarily designed to deter police misconduct, so "but for" causation is the start of the analysis, not the end. See *Brown v. Illinois*, 422 U.S. 590, 608-12, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975) (Powell, J., concurring).

The next question is whether an exception to the exclusionary rule applies. The exception at issue in Morlock's case is attenuation: when the connection between the illegal conduct and the challenged evidence "has become so attenuated as to dissipate the

taint," exclusion of the evidence is not required. *Nardone*, 308 U.S. at 341.

One of the leading cases is *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), which is still recognized in Kansas as the source of the attenuation rule. *Smith*, 286 Kan. at 419. In *Wong Sun*, one man made some statements in his own bedroom after six or seven officers broke down his door and entered. These statements were held inadmissible because his agreement to talk came so quickly after the unlawful act that it was "unreasonable to infer that [his] response was sufficiently an act of free will to purge the primary taint of the unlawful invasion." 371 U.S. at 486. But the statement of another defendant who returned to the police station several days later was admissible because any taint from the unlawful conduct had dissipated. 371 U.S. at 491.

The Kansas Supreme Court states that "a court may find that the poisonous taint of an unlawful search or seizure has dissipated because the connection between the unlawful law enforcement conduct and the challenged evidence became attenuated." *State v. Martin*, 285 Kan. 994, Syl. ¶ 3, 179 P.3d 457 (2008). We examine "the causal chain between unlawful conduct and the acquisition of evidence." 285 Kan. 994, Syl. ¶ 4. Three factors are commonly used to judge attenuation: (1) the time elapsed between the illegal conduct and acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the "purpose and flagrancy" of the official misconduct. *Martin*, 285 Kan. at 1003 (citing *Brown*, 422 U.S. at 603-04 [1975]).

The first factor is in the defendant's favor. Very little time elapsed between the travel-plan questions and Morlock's consent to search the van.

The second factor is in the State's favor. There was an intervening circumstance: the encounter had changed from a *Terry* stop, in which Morlock and O'Kelly were not free to leave, to a voluntary encounter in which they were free to go on about their business. The officer's routine in this case was virtually identical to the actions found in *Thompson* that indicated the traffic stop had ended, the driver was free to go, and a voluntary encounter had begun. Many other courts have concluded that telling a driver that he's

free to go is an intervening circumstance for purposes of analyzing attenuation in a traffic stop. *E.g., United States v. Esquivel,* 507 F.3d 1154, 1160 (8th Cir. 2007); *United States v. Infante-Pineda,* 2002 WL 32657208, at *8 (D. Neb. 2002) (unpublished opinion), *aff'd* 366 F.3d 961 (8th Cir. 2004); *State v. Harkless,* 1995 WL 756571, at *7 (Ohio App. 1995) (unpublished opinion); *State v. Garcia,* 123 S.W.3d 335, 347 (Tenn. 2003), *cert. denied* 541 U.S. 974 (2004); *cf. United States v. Santiago,* 310 F.3d 336, 343 (5th Cir. 2002) (finding no attenuation because the officer had not yet returned paperwork when the consent to search was sought and, thus, there was no intervening circumstance since the defendant was not yet free to leave). But see *People v. Rodriguez,* 945 P.2d 1351, 1364-65 (Colo. 1997) (no intervening circumstance when officer said driver was free to go and asked permission to search literally "[w]ith the same breath").

The third factor is also in the State's favor. As to flagrancy of the illegal conduct, there is none. The exclusionary rule recognizes that flagrant conduct—like six or seven officers unlawfully breaking down a bedroom door—is likely to have repercussions that a technical violation would not. Nor is there reason to believe that the officer intentionally did anything unlawful.

If this opinion demonstrates anything, I hope that it demonstrates that there is a reasonable basis for a police officer to believe that a few questions about travel plans and a warrant check may lawfully be done with a passenger in a traffic stop. That basis is even greater in Morlock's case since he had the ownership interest in the rented van. Any illegality here was minor and technical and wholly unknown to Morlock when he gave his consent.

When considering these factors, no single factor is determinative, though many courts consider the third factor the most important because it is directly tied to the goal of the exclusionary rule, which is deterring police misconduct. *State v. Lane,* 726 N.W.2d 371, 388 (Iowa 2007) (plurality opinion). The goal is to prevent "exploitation of [the] illegality" by police. *Wong Sun,* 371 U.S. at 488. Therefore, when considering consent for a search that's given after some illegal police conduct, the real question is whether the consent is the product of that illegality or whether it

has come " 'by means sufficiently distinguishable to be purged of the primary taint.' " *Lane*, 726 N.W.2d at 382 (quoting *Wong Sun*, 371 U.S. at 488).

The officer's request to search Morlock's van came *after* the officer had returned all paperwork to Morlock and his son and essentially told them they were free to leave. All of the brief conversation the officer had with Morlock and O'Kelly was in a conversational tone. There's not a hint of coercion here and no reason to believe that Morlock agreed to the search because he felt he had to since he had been asked a few questions about his travel plans. And even though the intervening circumstance in Morlock's case is not as strong as the voluntary trip to the police station several days later in *Wong Sun*, there is little if any causal connection between the supposed illegal conduct and Morlock's consent.

The United States Court of Appeals for the Eighth Circuit found attenuation and upheld a consent search in *Esquivel*, a somewhat similar case. The officer in *Esquivel* stopped three men who were driving in a rental car with no license plate. The officer didn't see a temporary registration permit or in-transit sticker, although he was able to confirm shortly after stopping the vehicle that it had a valid temporary permit. The officer asked the driver questions about travel plans and other matters but didn't proceed to write the warning ticket and let the driver go when he received radio confirmation that there were no warrants for the driver. Instead, he kept the driver in his patrol car while he went to question the two passengers about their travel plans, took their ID's, and ran a warrant check on them. Nearly 10 minutes passed before he finally gave the driver his warning citation and told the group they were "done with the traffic stop" and to have a safe trip. The officer followed that up with a request to ask more questions and then a request to search the van, just as occurred in Morlock's case.

The Eighth Circuit assumed for its decision that the officer had gone beyond what was permitted in the traffic stop but found that the consent to search the vehicle was voluntary and that the consent was free of any taint from any illegality. The court applied the same factors from *Brown* that are applied in Kansas. Despite the temporal proximity, the court emphasized that "the Trooper's an-

nouncement that the traffic stop was over and [the defendant] was free to leave was . . . an intervening circumstance between the presumed illegal detention and the consent." The court also noted that no intentional misconduct had been found by the district court. 507 F.3d at 1160; see also *United States v. Johnson*, 2006 WL 435975 (W.D.N.C. 2006) (unpublished opinion) (finding consent free of taint when defendant knew he was free to go and officer's error in opening car door to look at VIN was minor, only "minimally intrusive," and not purposeful), *aff'd* 258 Fed. Appx. 510 (4th Cir. 2007). I would therefore find that any taint of illegal conduct was attenuated in Morlock's case.

## Conclusion

The Fourth Amendment contains 54 words. If their meaning were not subject to debate, many trees would have been saved, many disputes averted, and Professor Wayne LaFave would not have been able to publish a multi-volume treatise containing by his count 1,687,149 words, mostly on the interpretation and application of the Fourth Amendment.

The Fourth Amendment prohibits only *unreasonable* searches and seizures, and what's reasonable is largely subjective. For guidance, we must rely upon—and ultimately abide by—the rulings of the United States Supreme Court. Its rulings as they relate to Morlock's warrant check are quite clear, which the Illinois Supreme Court unanimously determined in *Harris II*. The check of Morlock's name for outstanding arrest warrants did not appreciably lengthen this lawful traffic stop. And checking a passenger's name for warrants is even less intrusive than having a drug dog walk around the perimeter of a car, which the Court found proper in *Caballes*. Moreover, asking a few questions about travel plans is consistent with several Supreme Court rulings and caselaw elsewhere. Nothing in the Fourth Amendment was violated. No evidence should be suppressed.

I would affirm the district court's judgment.